Schwantes, Plaintiff in error, vs. The State, Defendant in error.

*January 13—January 30, 1906.*

(1) *Jurors: Qualifications: Aliens: Exceptions: Waiver.* (2–6) Corpus .delicti: *Circumstantial evidence, sufficiency, competency, and weight.* (6, 7) *Reasonable doubt.* (8–12) *Witnesses: Cross-examination: Impeachment: Competency.* (13–16) *Opinion evidence.* (17, 18) *Homicide.* (6, 7, 19, 20) *Instructions to jury.*

*Frank Schwantes*, aged about thirty-two years at the time of the principal event here mentioned, and William Klokow and wife, then about sixty-five years of age, were close acquaintances for over eighteen years. After residing for five years prior to such event about three quarters of a mile apart on farms, they made a contract whereby the Klokows conveyed their belongings to *Schwantes*, reserving a home on their farm, and the latter agreed to furnish them certain specified amounts of money and other articles annually for their support and care in case of sickness, securing the obligation on his farm and the one thus obtained. The arrangement soon became so intolerable that all determined to avoid it in some manner. They negotiated to that end upon the basis of a sale by the Klokows, to a point of substantial agreement. In the morning of the day *Schwantes* purposed making preparation to pay the Klokows, he was notified that they would not trade as expected. Thereafter during such day he spent the greater part of his time in making visits to the home of the Klokows and removing property therefrom to their annoyance. On his last visit they were not found at home, giving rise to the belief that they had gone. to put into execution a previous threat to foreclose their mortgage. T' ereafter about dark they were at home and in their usual state of health. They were not accustomed to be away from home nights. Before morning the house was destroyed by fire and they disappeared. Suspicion pointed to *Schwantes* as the cause. His conduct soon changed suspicion to belief. An investigation of the remains of the fire developed the presence therein of portions of one or more human bodies. Such proceedings were then had that in due course *Schwantes* was convicted of having murdered the Klokows, the evidence being wholly circumstantial.

1. If an alien serves on a jury without objection being seasonably made and insisted upon, his incompetency is thereby waived whether the case is civil or criminal.

2. The elements of *corpus delicti* may be established by circumstantial the same as by direct evidence.

3. Evidentiary circumstances relied upon and essential to establish any necessary element in a criminal prosecution must, in order to be efficient, be shown to exist to the satisfaction of the jury with the same degree of certainty as the ultimate object of inquiry is required to be to warrant a finding in the affirmative.

4. Whether any particular evidentiary circumstance claimed to exist tends, in any reasonable view, to prove any element essential to the success of a criminal prosecution, is a matter to be decided by the court on the *voir dire* and its conclusion cannot be disturbed, unless shown to be clearly wrong.

5. The weight of evidentiary circumstances is wholly for the jury. If, in their judgment, they point to the existence of the main object of search so strongly as to establish its existence to a moral certainty, they should find accordingly the same as in' case of belief to a like degree of certainty produced by direct evidence.

6. In a criminal prosecution the jury may be instructed that they should acquit the accused, unless the evidence in their judgment so strongly establishes his guilt as to exclude every reasonable theory based thereon of innocence. The instruction applies as well to direct as to circumstantial evidence, and' should not be given in a way to suggest infirmity as regards the latter.

7. If the evidence in a criminal prosecution is susceptible of producing belief of guilt beyond every reasonable doubt, and they find accordingly, their decision cannot be successfully challenged because in the judgment of others the evidence is only susceptible of producing belief of guilt to a less and insufficient degree of certainty.

8. Cross-examination of a party for the purpose of discrediting his evidence is governed by the same rules as that of any other witness.

9. Matters utterly irrelevant cannot be inquired into on cross-examination, even for the purposes of impeachment.

10. Questions on cross-examination are not relevant for the purposes of impeachment, unless it would be competent to prove the existence of the circumstance suggested by the questions otherwise, upon a proper foundation being laid therefor, where one is required.

11. Questions on cross-examination in regard to merely imaginary circumstances with no reasonable ground to expect favorable answers, or to be able to impeach the answers, are improper, and when permitted against objection to an extent liable to

prejudice the jury as to the truth of the matter in hand, it is harmful error.

12. Where the wife of a party acts as his agent in respect to any matter material to be established in a judicial proceeding, either respecting the particular subject of inquiry or a mere evidentiary fact in respect thereto, she is a competent witness for her husband as to everything done by her within the scope of such agency.

13. The scope of opinion evidence is not limited by the technical meaning of the term "science, art, or skill." It extends to and includes every subject in respect to which one may acquire special knowledge.

14. The preliminary questions respecting opinion evidence, i. e. that of the competency of the witness and that of whether the subject is within the scope of opinion evidence, are in the field of competency, in which the judgment of the trial court is conclusive, unless shown to be clearly wrong.

15. Opinion evidence as to a matter of common knowledge is not permissible, though not necessarily prejudicial.

16. A person of mature years may, regardless of whether he took note of the matter by a clock or watch, testify from his best judgment as to the time of day of any particular circumstance happening under his observation, or the time occupied by the occurrence.

17. In case of a prosecution for criminal homicide where the body of the victim was destroyed, it is not necessary to a conviction to establish beyond a reasonable doubt the precise means by which death was produced.

18. In respect to whether death was produced by criminal means it is proper to instruct the jury that they are permitted to consider any cause other than that charged, which may in any reasonable probability have acted in the matter, such as suicide or accident, or the act of some person other than the accused.

19. A trial court is permitted to instruct the jury as to a particular matter, calling attention to part of the evidence on each side in respect thereto, not giving undue prominence to any thereof, and coupling the same with an admonition that the particular evidence referred to, and all other evidence bearing on the question, should be considered.

20. The trial court in a criminal prosecution may by appropriate language admonish the jury to proceed to the discharge of their duty bearing in mind the importance of the result to the public and the accused as well.

[Syllabus by MARSHALL, J.]

ERROR to review a judgment of the circuit court for Marathon county: JAMES O'NEILL, Judge. *Affirmed.*

On the 11th day of November, 1901, during such term the plaintiff in error, in due form of law, was adjudged guilty of murder in the first degree,—in that on the 14th day of November, 1900, at such county, with malice aforethought he took the life of William Klokow and Ernestina Klokow, his wife,—and was in due form sentenced to be punished by confinement at hard labor in the state prison at Waupun, Wisconsin, during his natural life. Subsequently a writ of error was sued out of this court for a removal of the cause to this jurisdiction for review as to alleged errors duly preserved for that purpose. The history of the case will be given in the opinion.

For the plaintiff in error the cause was submitted on the brief of *Bump, Marchetti & Bump,* attorneys, and *Franklin E. Bump,* of counsel. They contended, *inter alia,* that being a capital case it was not competent for the defendant's counsel to waive the fact that one of the jurors was not a citizen, and it was error for the court to deny defendant's motion for a new trial because of the alienage of said juror. *State v. Vogel,* 22 Wis. 471; *Shumaker v. State,* 5 Wis. 324. If a defendant in a capital case can waive the absolute disqualification of alienage, he can waive trial by jury entirely. This he is not permitted to do, after a plea of not guilty, in the absence of an express statute. *State v. Lockwood,* 43 Wis. 403; *In re Staff,* 63 Wis. 285; *Mays v. Comm.* 11 Va. L. J. 88; *State v. Worden,* 46 Conn. 349; *Cancemi v. People,* 18 N. Y. 128, 136; *Morgan v. People,* 136 Ill. 161, 26 N. E. 651; *Harris v. People,* 128 Ill. 585, 21 N. E. 563; *King v. State,* 87 Tenn. 304, 3 L. R. A. 210, 211, n.; *Gore v. State,* 52 Ark. 285, 5 L. R. A. 832, 836, n.; *Brown v. People,* 20 Colo. 161, 36 Pac. 1040.

For the defendant in error there was a brief by the *Attorney General* and *A. C. Titus,* assistant attorney general, and

*Neal Brown,* of counsel, and oral argument by *Mr. Brown* and *Mr. Titus.* They contended, *inter alia,* that the objection of the defendant to the jury was not well taken and that whatever irregularities there might be could be waived as in other cases. *In re Roszcynialla,* 99 Wis. 534; *Rowan v. State,* 30 Wis. 129; *Bonneville v. State,* 53 Wis. 680; *Williams v. State,* 61 Wis. 281, 292; *Miller v. State,* 25 Wis. 384; *Reynolds v. U. S.* 98 U. S. 145; *Stewart v. State,* 15 Ohio St. 155; *Kingen v. State,* 46 Ind. 132; *Croy v. State,* 32 Ind. 384; *People v. Webb,* 38 Cal. 467; *State v. Glass,* 50 Wis. 218; *Dickerson v. State,* 48 Wis. 288; *People v. Kelley,* 47 Cal. 125; *People v. Gibbons,* 43 Cal. 557; *State v. Wentworth,* 65 Me. 234; *State v. Polsen,* 29 Iowa, 133; *Sarah v. State,* 28 Ga. 576; *Emery v. State,* 101 Wis. 627, 645. The *corpus delicti* might be established by circumstantial evidence. *Stocking v. State,* 7 Ind. 326; *State v. Williams,* 7 Jones (N. C.) 446; *McCulloch v. State,* 48 Ind. 109; *Comm. v. Webster,* 5 Cush. 295; *State v. Dickson,* 78 Mo. 438; *Smith v. Comm.* 21 Gratt. 809; *Ruloff v. People,* 18 N. Y. 179; *State v. Brown,* 1 Mo. App. 86; *U. S. v. Williams,* 1 Cliff. 5; *State v. German,* 54 Mo. 526, 530; *Wilson v. State,* 43 Tex. 472. Circumstantial evidence need not exclude every possibility of defendant's innocence. *Findlay v. State,* 5 Blackf. 576, 36 Am. Dec. 557; *Sumner v. State,* 5 Blackf. 579, 36 Am. Dec. 561; *Comm. v. Goodwin,* 14 Gray, 55, 57; *People v. Williams,* 32 Cal. 280, 283; *People v. Lambert,* 5 Mich. 349, 367; *Martin v. State* (S. C.) 25 S. E. 113; *Comm. v. Johnson,* 162 Pa. St. 63, 29 Atl. 280; *State v. Smith,* 9 Wash. 391, 37 Pac. 491.

MARSHALL, J. The following circumstances appear conclusively from the record without controversy, or there is evidence tending to establish the same: William Klokow and Ernestina Klokow were foreign born. They were Germans of humble degree. They settled on the northeast quarter of

the northeast quarter. of section 3, town 26, range 2 east, in Marathon county, Wisconsin, about the year 1883, and there resided until the 14th day of November, 1900. The last seen of them while living, so far as known, was on the evening of that day. Their remains were subsequently discovered as hereinafter indicated. They made improvements on their land, fitting the same for a moderately comfortable country homestead for humble people of their class. They lived alone and rarely went away from their farm. Their uniform custom was to be at home nights, and to retire early after dark. For a considerable period of time prior to the day named, the buildings on the place consisted of a log house, a barn of considerable size located a short distance northwesterly thereof, a small horse barn, a fair-sized barn for small stock, a granary and wagon shed, and one or two other small structures, all the outbuildings being located at convenient distances from the house and in westerly ranges therefrom. The house faced the east with the front part about 103 feet from the highway on the east line of the forty. The body of the house was sixteen by twenty feet. It was constructed of hewed logs to the height of about twelve feet, made tight at the points of union between the logs with clay mud. The roof and gables of the house were of boards and shingles and timber supports. The cellar was curbed with logs. On the back part of the house there was a lean-to made of lumber, used for a summer kitchen during a portion of the year, and otherwise as a woodshed and storehouse. The house was whitewashed inside and out and there was considerable clay mud used in its construction inside, particularly in the ceiling. In the northeast corner there was a small bedroom used by the Klokows for their sleeping apartments. In the northwest corner there was a small pantry. The attic part of the house was reached from the inside by a ladder. There was a front door about midway on the front side of the house and a window on each side, one opening into the bedroom and the other into the living room.

There was a back door opening into the woodshed and one from the woodshed to the outdoors.   There was a window on the north side of the house opening from the pantry, and one at the south side opening into the living room, and one on the back part of the shed.   There was a cook stove located a few feet southeasterly of the door opening into the bedroom and about midway. of the house east and west. and in a line with the front door.   There was a box stove used as a heater towards the southerly side of the house and in a line with the cook stove, the pipe from the heater being connected with the pipe from the cook stove, thence into the chimney.   Both stoves were customarily used at the time of year of the occurrence in question.   The box stove was somewhat imperfect. The door would not stay closed securely by the ordinary fastenings.   A brace was used to remedy that.   The door had been known to unexpectedly come open and allow coals of fire to escape to the floor.   The bed in which the old people slept was so located that one standing outside of the house at the window could readily see the occupants, if there were such and the window was not curtained.   Mrs. Klokow at the time of her disappearance was about sixty-four and her husband about sixty-five years of age.   She was in fairly good health for one of her years and able to perform pretty hard work indoors and out, which she customarily did.   He, some years before his disappearance, had a stroke of apoplexy of a serious character from which he did not thereafter wholly recover. It affected his bodily strength and impaired him mentally. East of the Klokow place in a direct line a little over three quarters of a mile, for some five years before the disappearance, the accused resided.   The distance between the two places by way of the highway was about one mile and a quarter.   The route of travel lay north from the home of the accused nearly a quarter of a mile, thence west three quarters of a mile, thence south about fifty-two rods.   There was little or no travel along this road from the direction of the

home of the accused, except by himself and family and such persons as had occasion to go to or from his place. The road was not extended east of his home. Small brush and trees to some extent obscured the view of the Klokow buildings from the home of the accused, though they could be seen therefrom. A little northwest of the Klokow home, about 1,057 feet therefrom, and on the north side of the highway which lay on the north side of the Klokow land, was the home of August Schwantes. That was about thirty-two rods from where the road turned east going from the Klokows toward the home of the accused. The home of August Schwantes was so located that the end of the Klokow house was visible therefrom, the rest of the house being obscured by Klokow's large barn. West of the former's home and on the same side of the road, about half a mile in a direct line from the Klokow place, was the home of Fred Schwantes. Further west at a point about three quarters of a mile from the Klokow place and in a direct line therefrom about 700 feet north of a direct line east was located the home of J. A. Butters. Still further west, about one quarter of a mile, were the homes of H. Schwantes, F. Korth, and one Schilling. There were homes of some other settlers within easy reach of the Klokow place and that of the accused. The lay of the country between the Klokow place and the others mentioned was uniformly level, and where not cultivated it was wooded with a light growth of brush and small timber. The conditions were such that from the August Schwantes place, as before indicated, the Klokow place was in plain sight. It could also be quite plainly seen from the Butters place and from Korth's place.

To summarize the physical situation above indicated, one standing at the Klokow place looking directly east, the line of sight being partly obstructed by small brush and trees, would have the home of the accused in view at a distance away of three quarters of a mile. Turning so as to look northwesterly and along the east end of the Klokow large barn, one would

have the August Schwantes place in sight a little over 1,000 feet distant. Turning further to the west so as to look nearly in a direct line northwest, the home of Fred Schwantes, located nearly one-half mile away, the line of sight being interrupted somewhat by small brush and timber, could be seen. Turning still further to the left, the line of sight would intercept the home of H. Schwantes one mile distant. Continuing the turn to the left so as to look nearly west, the line of sight would then be interrupted by the home of J. A. Butters, which could be seen over the tops of small trees. About three quarters of a mile further on in a direct line to a distance of about one mile from the point of sight the Schilling place was located. Further turning to the left so as to look directly west, the line of sight would be cut at a point about one mile from the point of observation by the Korth home, from which over the tops of small trees the Klokow place could be seen. Within the ranges mentioned there was located the home of Charles Cramer, one and one-half miles distant, and some others. The accused at the time of the disappearance mentioned was thirty years of age. He had been married several years. His family consisted of a wife and three children. His acquaintance with the Klokows covered the entire period of their residence in Marathon county. He had been for several years one of their most intimate neighbors. They visited back and forth frequently and exchanged work. Sometime prior to the 15th day of September, 1900, it occurred to Mr. Klokow, by reason of his declining years and infirmities, that it was best to use his property so as to provide for the keep of himself and wife during the rest of their days without his continuing to work the farm. He then had the forty acres mentioned with the improvements thereon, the crops produced or growing for the season of 1900, consisting of hay and grain, a fair supply of farm machinery, a span of horses, and some cattle, hogs, and sheep. He discussed the subject of the disposition of his property with the accused on several occasions,

the mutual intentions being that the latter should in some
way acquire the place, if a satisfactory agreement could be
reached and thereby the old people be provided for.  During
all of the negotiations leading up to the final conclusion the
Klokows were not advised by any one, save the accused.  The
first talk related to a sale of the place outright.  Negotiations
to that end covered quite a period of time, during which the
accused declined to give the Klokows the consideration they
sought to obtain.  The property was incumbered by $250
as to the realty and a small sum as to the personalty.  An
agreement was finally reached between the parties, in a gen-
eral way, for the accused to take over the property, the
Klokows reserving the right to a home thereon during the
residue of their lives, and the accused agreed to render to
them each year certain moneys, groceries, and other articles
for their support.  Whereupon the accused and his wife and
the Klokows visited the office of Mr. Edw. J. Hahn, in
Marshfield, Wisconsin, for the purpose of settling the details
of their arrangement and having the same executed in writing.
The matter was not concluded on the first visit, but on one
made the succeeding day all of the Klokow property by appro-
priate conveyance was transferred to the accused.  An agree-
ment was entered into securing to the Klokows the use of the
dwelling house during their natural lives and one acre of land
in connection therewith, some stable accommodations, and
each year a stipulated amount of money, provisions, and other
articles for their support, and certain care, specified, in case
of sickness.  A bond was entered into by the accused to se-
cure the performance of his agreement and all was secured
by a mortgage upon the real estate conveyed and upon the
farm owned by him.  Very soon after this transaction the rela-
tions between the parties began to be unpleasant.  The women
were active participants in the trouble.  The matter became
a subject of neighborhood talk, which displeased the accused.
His conduct toward the old people, from their standpoint,

was unreasonably harsh and wrongful. It greatly irritated them. They claimed that he did not provide for them as agreed. On his part he claimed that he lived up to his agreement to the letter. He removed the hay from the place and took away the horses and otherwise exercised dominion over the property to the mental disturbance of the old people. They had no way of going from home to church or otherwise, except on foot, which they were not accustomed to do. To remedy the matter they were compelled, as they supposed, to earn money to obtain a horse. By about sixty days after the making of the contract the relations between the parties became very hostile. There were frequent disputes and quarrels, stopping short of physical violence, in which the women took an active part, resulting in the Klokows, on one side, determining to recover back the property or to obtain relief in some way by a foreclosure of his mortgage, and to the knowledge of the accused, and the latter determined, if he could, to buy out their interests for a money consideration and end the trouble in that way. He negotiated with them to that end, resulting in a partial agreement as he supposed, and he took some steps to obtain the money which might be required. In the early days of November after the contract was made he visited an insurance agent, who prior to the contract insured the buildings for Mr. Klokow, expressing a desire to have the insurance duly transferred, and the amount increased. He had the policy with him at that time and his attention was called to the fact that it had not been assigned by Klokow. On the 12th or 13th day of November thereafter the agent received the policy from the accused by mail with the blank assignment printed thereon signed by the name of William Klokow. That was accompanied by a request on the part of the accused to increase the insurance $275 on the hay and some farm machinery. The accused visited the Klokow place on the 14th day of November, 1900. He was on his way to complete negotiations in regard to obtaining money to buy the

old people out. It was in the morning. He saw Mr. Klokow and was informed that there was no use of obtaining the money for Mrs. Klokow had made up her mind that she would not sell. He returned home and later went back, his wife accompanying him, at which time they drove the sheep away, the Klokows protesting. During the first trip there was talk about his delivering to the Klokows some flour. He neglected to take the flour to them on the second trip. He made a third trip in the afternoon, at which time he took the old people the flour. He was unable to enter the house, as he claimed, finding both doors locked and not being able to obtain any response from the signals of his presence. He thereupon, as he claimed, put the flour in the granary. He then loaded up some lumber which he knew the Klokows did not wish to have him remove, and took the same to his place. The Klokows were as well as usual that day. After the time of the last visit aforesaid, and in the edge of the evening, they were at home. Sometime during the night following the house was wholly consumed by fire. The last seen of the old people alive was as aforesaid. No one was present during the progress of the conflagration, except the accused. It was not observed by any one, so far as appears, except him until after midnight, when it was seen from the Butters place. About half-past 5 in the morning the house was discovered to have been burned, by near neighbors. It was then not wholly consumed though it was substantially. A light snow fell during the night in which the tracks of some one were plainly visible; indicating that the person who made them did so in traveling from the Klokow place north to the turn of the road towards the home of the accused, and thence east on such road. He first came upon the scene the day after the fire at 7 or 8 o'clock. He visited the home of August Schwantes and inquired for the Klokows. He made no movement to examine the ruins or any suggestion in that regard. He visited various places and inquired of persons

there if they had seen the Klokows. No one but him, so far as appears, had any motive for destroying them. There were many circumstances of more or less significance pointing to him as guiltily concerned in their disappearance. He was soon suspected in that regard. He knew that fact and that the supposition was that the remains of the old people would be discovered in the ruins. The most significant of such circumstances, except those leading up to the time of the fire, were these: A strong probability that the fire occurred after 12 o'clock, at a time when it was least liable to attract attention, while he claimed it was first discovered about, or just before, 10 o'clock in the evening. Though he knew of the fire and was on the ground by 10 o'clock in the evening, as he confessed, he made no reasonable efforts to acquaint the neighbors with the circumstance of the fire or that of the disappearance of the old people, and made no effort to satisfy himself as to their whereabouts, until quite late on the following morning. He stood around, as he confessed, while the building was burning and then went home and to bed apparently unconcerned as to their fate. There was a light snow during the night. The tracks, evidently of the accused, indicated that they were made after the snow fell. In going to the fire, as he confessed, he proceeded by way of the road, a distance of about a mile and a quarter, instead of in a direct line which was about half a mile nearer. He showed more interest in the subject of insurance on the building than solving the mystery of the disappearance. When the ruins were officially examined to verify the supposition that the remains were there, which occurred two days after the fire, he seemed to shun the place. When, by invitation of the coroner, he visited the immediate scene and was informed of the vital interest people thought he had in the matter, particularly because of his being suspected of having fired the house and burned up the old people, he still remained indifferent. Though he was given a shovel by an officer and requested to assist in examin-

ing the ruins he neglected to do so and left the premises.  He·
made no excuse for his conduct while there, except that he·
did not believe the remains were in the ruins but thought the
Klokows went to a weaver's living some eight miles away.
Though admonished by the officer to make search for them,.
if he thought they left the building, he did not visit the
weaver mentioned, and later denied having said to the officer·
that he thought they went to the weaver's, and denied that·
there was any such place.  The examination of the ruins re-
sulted in its being demonstrated to a moral certainty that the
remains of one or more human beings were there.  Some·
bones and some teeth were found, which were shown to have·
been parts of a human body.  Also a truss was found, such
as Mr. Klokow was wont to wear.  The story of the accused·
from the first was that he was informed of the existence of the·
fire by his wife some time after he retired for the night, and
about 10 o'clock; that he observed at once that it was in the·
direction of the Klokow place; that he hurriedly dressed and
went to the scene by way of the highway, stopping at the point
where the road turns south, about thirty rods from the home
of August Schwantes, and hollering three times; that when he
arrived at the fire it had progressed so far that he could not
enter the house; that he remained on the premises until about
12 o'clock, when the building was so far consumed that the·
outbuildings were substantially out of danger; that he then
returned home and retired; that he paid no further attention
to the matter until he got his chores done the next morning,
when he started out and made inquiries, as before stated.·
Soon after the discovery of the remains, as aforesaid, a cor-
oner's inquest was held, and thereupon in due form of law·
he was charged with having maliciously taken the life of the
·Klokows.  All these facts and others of a corroborative char-
acter, but by themselves of minor importance, were brought
out on the trial.  Under instruction by the court the jury, as
indicated, decided that the evidence established beyond all

reasonable controversy that the lives of the Klokows were taken by criminal means, and that the accused was the guilty party. Various exceptions to rulings made during the trial and after the verdict were preserved for consideration, and in due form errors are now assigned thereon, which will be considered in detail.

By an oversight, the jury as impaneled and sworn included an alien. Both sides were ignorant of that circumstance until the trial had proceeded about a day. The incompetent juror then took out his second papers and the trial proceeded not only without objection on the part of the accused by reason of the incident, but by express consent given by his counsel. It was claimed after verdict, and is now claimed, that fatal error was committed in that respect. As counsel for the state suggest, this court has repeatedly held that the inclusion of an incompetent juror in a panel duly sworn in an action and service by such juror to the end of the trial does not invalidate the verdict, unless an objection to such juror on that ground is seasonably made and is insisted upon. Otherwise his participation in the trial will be deemed waived. That rule applies to criminal as well as civil cases. *Hogan v. State,* 36 Wis. 226; *Flynn v. State,* 97 Wis. 44, 72 N. W. 373; *In re Roszcynialla,* 99 Wis. 534, 75 N. W. 167; *Emery v. State,* 101 Wis. 627, 78 N. W. 145; *Cornell v. State,* 104 Wis. 527, 80 N. W. 745.

The most important complaint, as it seems to us, though not the one given the greatest prominence in the argument of counsel for plaintiff in error, in order of presentation at least, is that the verdict is not sustained by the evidence, in that the *corpus delicti* was not established with the requisite degree of certainty in any reasonable view of the matter. It is not contended but that the jury were fully warranted in finding from the evidence that the bodies of Mr. and Mrs. Klokow were destroyed by the burning of the house, but it is insisted that they were not warranted in deciding that the deaths of

the Klokows were produced by criminal means. True, the evidence to the jury on that point was purely circumstantial. True, also, it was the duty of the jury to find in favor of the accused, if in their judgment there was any reasonable theory based on the evidence that their deaths were not criminally produced. But the rule in that regard applies in a case of direct evidence as well as one of circumstantial evidence. The requisite degree of certainty to establish any essential fact in a criminal case is susceptible of being reached by one as well as the other, as this court in regard to the very matter in hand, upon careful consideration of the subject, decided in *Buel v. State,* 104 Wis. 132, 80 N. W. 78.

In testing the verdict of a jury having no direct evidence to support it as to the most essential element of the *corpus delicti,* no different rule is involved than in any other case, though there may be far less difficulty in reaching a conclusion that the verdict was unwarranted when there is more or less direct evidence on the point than otherwise. The field of reasonable inference from circumstantial guides is very broad. The trial court must necessarily determine whether any particular evidentiary fact by itself or with others in any reasonable view of the matter suggests the existence of the one sought for. Having arrived at a conclusion in the affirmative on that point the field of jury labor commences and within all reasonable limitations necessarily controls as to the result.

Wharton in his work on Criminal Evidence (9th ed.) at § 10 thus pictures the misunderstanding liable to occur as to the weight of circumstantial evidence:

"Much embarrassment has arisen over the position advanced by two eminent text writers, that, to justify the inference of legal guilt from *circumstantial* evidence, the existence of inculpatory facts must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt. Judges, on hearing these expressions, have been apt, in the hurry of a trial, to accept and apply them; and hence have sprung up a

series of *dicta* to the effect that circumstantial evidence is to be viewed with distrust, and that, to justify a conviction on circumstantial evidence, it is necessary to exclude every possible hypothesis of innocence."

As has been indicated, circumstantial evidence must be sufficiently strong to exclude every reasonable theory of innocence, and that is likewise true of direct evidence. There should be no distrust thrown on the former even in regard to proof of the essential elements of the *corpus delicti*. If the punishment of criminal offenses were to wait upon the production of direct evidence of the body of the crime, or any other element necessary to conviction, there would be immunity in that regard in perhaps the majority of the most serious cases of criminal homicide and other most heinous offenses. In no other way can society be efficiently protected, wrongs redressed, and rights protected than to abide by what has been said. The instruction to a jury in cases of this kind often given, and very appropriately, that they should render a verdict of not guilty, unless, after a careful consideration of all the evidence, there is no reasonable theory based thereon consistent with the innocence of the accused, is not to be regarded as specially required because of special infirmity in circumstantial evidence, but as a method of emphasizing the rule that an accused person is entitled to go free unless his guilt shall be established beyond a reasonable doubt, and an admonition on account of the very serious nature of the consequences that might otherwise follow failure, to proceed with the greatest consideration and care, avoiding, so far as possible, all danger of giving way at any point to mere suspicion. Said an eminent judge:

"The truth is, that notwithstanding the admitted infirmity of human testimony, and the inherent defects of circumstantial evidence, they still are, and forever must be, the only solid foundations, on which reliance can be placed, for the due administration of all civil as well as of all criminal justice."

STORY, J., in *U. S. v. Gibert,* 2 Sumn. 19, 28, Fed. Cas. No. 15,204.

"Circumstantial evidence is often stronger and more satisfactory than direct, because it is not liable to delusion or fraud." WHITMAN, C. J., in *Re Thorn,* 6 Law Rep. 49, 54.

"Circumstantial evidence is, in the *abstract,* nearly, though perhaps not altogether, as strong as positive evidence; in the *concrete* it may be infinitely stronger. A fact positively sworn to by a single eye-witness of blemished character is not so satisfactorily proved as is a fact which is the necessary consequence of a chain of other facts sworn to by many witnesses of undoubted credibility." GIBSON, C. J., in *Comm. v. Harman,* 4 Pa. St. 269, 271.

Evidentiary facts established by evidence more or less direct pointing logically to the ultimate subject of search, have always been, and must necessarily always be, essential instruments in the administration of justice, and when established as they all should be, with the same degree of certainty as the ultimate fact is required to be established, they do not fall below, in probative force, direct evidence. One is as competent as the other to prove the real subject matter of the inquiry. From such evidentiary facts we reason inductively. Certain *indicia* are known by experience to characterize human actions. Those concomitant with any particular act being ascertained with the degree of certainty required as to the main fact, the latter, we reason logically, must necessarily exist also. Such process of reasoning goes to the ultimate point of inquiry with well-nigh, if not quite, the certainty of exact demonstration. We first conjecture that the subject of search exists and is discoverable. We prove its concomitant facts according to human experience and by the illumination thus produced we dissolve the mist characterizing the conjecture and bring into definite outlines that which was before hidden. *People v. Kennedy,* 32 N. Y. 141. If the picture thus disclosed to our view is the only one that can reasonably exist under the circumstances we stamp it, so to speak, as the truth

of the matter to a moral certainty,—the highest degree of certainty attainable in human affairs. *People v. Harris,* 136 N. Y. 423, 429, 33 N. E. 65. So it is said that "certain laws of moral conduct operate almost as infallibly as the mechanical laws of the material world."

It follows that if the evidentiary circumstances relied upon by the prosecution to prove the body of the crime in this case do so with the degree of certainty required in any reasonable view of the matter the weight of evidentiary suggestions was, wholly for the jury to determine. In that light it seems that such facts were sufficiently established to carry the case to the jury in respect thereto. Most of them were established beyond controversy.

From all the evidence it appears clearly that the house was ignited on the inside. There is no suggestion in the record that the fire might have occurred by accidental means, except that it might have been started by a defective stove. Whether it was so started or whether, on the whole, there was any reasonable doubt about the matter was purely a jury question. The old people, according to the evidence, slept in a room separate from the one the stoves were located in, having a window affording easy egress from the building. The jury may well have deemed it wholly improbable that they were both overcome by heat or smoke before they had time to escape. The circumstances which occurred before, particularly on the fatal day, and those which occurred during the succeeding two days, as regards the conduct of the accused, may well be said to point with moral certainty to his having criminal knowledge of how the fatal occurrence took place. Looking at it from any reasonable standpoint, it is out of all harmony with innocence.

The relations between the parties a few days before the fire were so strained that both sides resolved to end the difficulty some way. The accused had been able to bridge over the matter so as to enable him to discuss with the old people

the question of a contractual settlement and to substantially, as he supposed, agree upon a basis therefor. During that time, as it seems, if at all, he secured Mr. Klokow's signature to the blank assignment on the insurance policy. That such assignment was not filled out and that the name was not affixed thereto at the particular time thereof are very suspicious circumstances, as the jury might well have viewed the matter. On the day of the tragedy the conflict was found by the accused to be irreconcilable upon any basis which he was willing to abide by, and straightway he proceeded to conduct himself regardless of the feelings of the Klokows. He was informed in the morning by the old gentleman that a settlement on the basis which he had supposed was satisfactory was out of the question: that his efforts in that regard were fruitless. He had good reason to suppose that the attitude of the Klokows in that regard meant submission by him or a judicial fight to the finish, jeopardizing not only his right to the property he held under the Klokow deed, but his own homestead. It seems, as the jury might well have concluded from the succeeding events of the day, that he was exceedingly angered thereby and became desperately inclined to proceed thenceforth according to his own notions of his rights under the contract, wholly regardless of whether it pleased or displeased the old people. He went home and soon re-appeared in company with his wife, whom he would not have brought upon the scene except in reckless disregard of the feelings of the Klokows, since the relations between her and Mrs. Klokow were particularly unpleasant. On this trip the sheep were driven away. He made a second trip in the afternoon and carted away lumber which he knew would greatly displease Mr. Klokow. Whether he was legally entitled to do as he did is not the question. His actions indicated the state of feelings between the parties and that it was one of bitter hostility.

On his last trip to the Klokow place, taking the accused at his word, he found the old people absent, affording him strong

reason to believe, in view of what had occurred during the day, that they had gone to initiate proceedings, or attempt to do so, to foreclose the mortgage. The condition as night came on, if the accused was morally weak enough to give way to the thought of ending the difficulty by destroying the Klokows, was such as to furnish an adequate motive therefor. No one else had any motive whatever to harm them or their possessions. There was good reason to believe with a high degree · of certainty that the accused falsely stated the time when the fire started and that he made efforts to have August Schwantes come upon the scene. There was like reason for believing that instead of the fire starting at or before 10 o'clock in the evening, when it would have been liable to attract the attention of neighbors, it started after midnight and when least liable to attract such attention. One circumstanced as the accused was when he first saw the fire, taking him at his word, if he was innocent, would most naturally have taken the swiftest method and the shortest cut to the scene, instead of going on foot and nearly one-half mile out of the way. Arriving upon the scene and finding the doors closed at all points and so full of fire as not to admit of its being entered, or even looked into efficiently, and no indication that the inmates had departed therefrom, any one acting naturally under normal conditions would at the earliest possible moment, not waiting for a night's rest, have aroused the neighbors, and not being able soon to solve the mystery of their disappearance would have concluded that they were in the ruins and have taken all reasonable measures to verify such conclusion. The conduct of the accused in those respects, the jury were warranted in believing beyond all reasonable doubt, was not reconcilable with any reasonable theory of innocence, and that it was consistent with the idea that the accused knew an early disturbance of the ruins: a disturbance before the fire had time to do its work, would expose to view certain evidence of his crime. He made no suggestion at any time for an examina-

tion of the ruins.  His conduct, as the jury had good reason to believe, was deliberately designed to delay such examination as long as possible.  When the examination was in progress, as shown, he exhibited reluctance to be present and refused to assist in the work, suggesting that he believed the Klokows were on the night of the fire at a carpet weaver's, some eight miles away, though he had no such thought as he afterwards confessed and knew there was no such place for them to resort to.  True, he denied making any such suggestion, but the jury were permitted to disbelieve him.  Taking all the circumstances together they make out a pretty strong case, both as to the elements of the *corpus delicti* and as to the accused being the guilty party,—much stronger than many found in the books where verdicts of guilty were sustained upon appeal.  Samples of such cases are given in *Buel v. State,* 104 Wis. 132, 142, 80 N. W. 78, the most significant being *State v. Williams,* 7 Jones' Law (N. C.) 446, and *People v. Alviso,* 55 Cal. 230 (erroneously cited in the *Buel Case* as *"Ex parte Kearney,* 55 Cal. 212").  Notwithstanding decisions may be found to the contrary, it is now elementary that in cases where, on account of the secretion of the body of the murdered person by burying the same at sea, or destroying it by fire or acid or other means, proof of the body of the crime by direct evidence is utterly impossible, and it is not regarded as in any sense necessary.  Wharton, Homicide (2d ed.) § 640; *U. S. v. Gibert,* 2 Sumn. 19, Fed. Cas. No. 15,204.

Special complaint is made of the manner in which the state's attorney was permitted to cross-examine the accused. A large number of questions were asked based, as claimed by counsel for the accused, on mere imagination as to how the accused might have destroyed the old people and how he might have appropriated their personal belongings, in the whole suggesting the commission of the crime in a most brutal manner and the appropriation of the personal belongings of the victims.  One difficulty with the matter is, generally speaking,

the questions were not objected to.   That is probably ac-
counted for by the fact that at the outset when objection was
made the learned court said, in effect, that the cross-examina-
tion of a party who offers himself as a witness is not gov-
erned anywhere like that of other witnesses; that to "test his
credibility or his accuracy or his memory" the court may per-
mit such questions as it sees fit, even in respect to "utterly
irrelevant matters."   That may have persuaded counsel that
there was no use of objecting further and to permit the very
extravagant examination now complained of to proceed as it
did at intervals, without further protest.   The learned court
was certainly wrong in ruling that the method of cross-exami-
nation to discredit a party, in the event of his being a wit-
ness, is any different from that in respect to any other wit-
ness.   There is no rule with which we are familiar sanction-
ing any different method of examining one witness from that
for examining another, for the mere purpose of discrediting
his evidence, nor permitting the door to be thrown open so ·
wide for impeaching evidence as to allow questions to be
asked upon the pretense that the object is impeachment when`
there is no reasonable ground to expect favorable answers or
to prove by direct evidence that the unfavorable ones are false,
the sole tendency being, if not the purpose, to create suspicion
in the minds of the jury prejudicial to the party.   When
questions are merely asked to browbeat, so to speak, or to an-
noy and confuse, or to create mere suspicion, they should not
be allowed whether objected to or not.  1 Wigmore, Evidence,
§ 781.   The learned court was wrong in saying for the pur-
poses of impeachment the examination of a party, or any one
else, can extend to matters "utterly irrelevant."   The credi-
bility of a witness upon a trial is an important feature of the
case.   Whatever tends legitimately to impair it is material:
is relevant.   Evidence having no such tendency, not otherwise
material, is wholly collateral and falls within the rule of ab-
solute exclusion.   Anything so remote or collateral as not to

be a legitimate subject of proof as an independent fact at any, stage of the case cannot be proved on cross-examination for the purposes of impeachment. That is, "matters utterly irrelevant" are not to be established by any method for any purpose. A witness may be asked on cross-examination if he has not been convicted of the commission of a criminal offense for the purpose of discrediting his evidence, because it is competent to prove such conviction as an independent fact for the same purpose. In other words, because the evidence is relevant, not direct to the main issue, but to the credibility of the witness produced to maintain such issue. *Att'y Gen. v. Hitchcock,* 1 Exch. 91, 93; 2 Wigmore, Evidence, §§ 1003, 1021; *People. v. Chin Mook Sow,* 51 Cal. 597. True, proof of independent facts of the character stated must ordinarily, first, as a matter of justice to the witness, be preceded by his examination in respect thereto, but such examination is permissible because the facts sought to be elucidated are not wholly irrelevant.

From what has been said it seems that the grounds for the learned court's ruling were wrong even if the examination can be justified. There is no disposition to restrain the broad discretionary authority of a trial court as to permitting a most searching cross-examination for the purposes of impeachment. Such an examination is a very important instrument in the administration of justice, but it has its limits. When the questions are asked within the legitimate field, discretionary authority should not be exercised to allow it to proceed unfairly. The examination should not be allowed to enter the domain of merest conjecture, counsel not having any expectation whatever of receiving answers in harmony with imagined facts, or ability to prove such facts directly or circumstantially. Such mere imaginings, which cannot in the very nature of things be verified, should not be the basis of questions to a witness, which can serve no other purpose but one to create prejudicial suspicion in the minds of the jurors.

We are constrained to say that the circuit court in this case

allowed the examination of the accused to proceed too far, and yet we hesitate, we decline, to condemn it as remediable harmful error, because only the initiatory question, which, standing by itself, was not appreciably prejudicial, was objected to, and because there was some shadow of excuse for the questions. There was evidence strongly indicating that the accused took the lives of the Klokows by violence in some way. An ax was found near their remains which might have been used to perpetrate the deed. There was proof that some of the bones found were broken by means other than the effect upon the body of the fire and its consequences. *Buel v. State, supra,* and *Barton v. Bruley,* 119 Wis. 326, 96 N. W. 815, relied upon by counsel for plaintiff in error, do not apply because the questions here were all within the field of the *res gestæ.* There is some ground for sustaining the court's action as within discretionary authority, in a very broad view of it, aided by the fact that the examination complained of, in the main, occurred without objection. It were better not to have permitted it. We say this without intending to cast the slightest reflection upon the motives of the eminent judge who presided at the trial.

Complaint is made because the wife of the accused, who acted as his bookkeeper in respect to articles furnished the Klokows under the contract, was not permitted to verify the book which she kept. The evidence was offered with other proof for the purpose of showing that the complaints made by the Klokows as regards the accused having failed to keep his agreement were without foundation. We are unable to see how the point is material under all.the circumstances,— whether the accused was or was not derelict in his duty. The fact is undisputed that the old people were dissatisfied with his conduct and that the relations between the parties were so strained at the time of the fatal occurrence that the accused was bent on terminating the contract in some way, and the Klokows were likewise determined. The state of feeling ex-

isting, not the cause of it nor the real right of the matter, was the basic feature of the motive for destroying them. The ex- clusion of the evidence was likewise nonprejudicial because the book was received in evidence upon the verification of the accused either as an independent evidentiary instrument or as a part of his evidence. All the charges were as fully estab- lished as they could have been by the addition of the evidence of Mrs. Schwantes. The book was fully identified as the one kept by her, and was verified without objection as being a true record, and was received in evidence before she was called to the stand. She was "only called to identify the book and the entries," not to verify it so as to make the same inde- pendent evidence. That having been sufficiently done, or the defect in that regard waived, the exclusion of her evidence certainly was harmless, though we must say in passing that the ground stated for the ruling is unsound. By one of the most familiar rules a wife is a competent witness to testify to anything which she does within the scope of her agency for her husband. The idea of the learned court that she could not testify at all, regardless of that rule, because "the ques- tion was not based on the book" is novel. We are not familiar with any such rule. There is none, we are constrained to de- clare most distinctly. On the contrary, in any situation, where an evidentiary fact is material as regards a party to an action, and the wife of such party acted as his agent in regard to the matter, her acts within the scope of her agency may be testified to by her. *Birdsall v. Dunn,* 16 Wis. 235; *Mountain v. Fisher,* 22 Wis. 93; *Chunot v. Larson,* 43 Wis. 536; 3 Jones, Evidence, § 758.

Further complaint is made because of the exclusion of opin- ion evidence as to how such a house as the one in question would burn. The learned attorney general justifies that upon the ground that the evidence did not relate to matters of "sci- ence, art, or skill," citing *Daly v. Milwaukee,* 103 Wis. 588, 79 N. W. 752, and similar cases. The quoted expression,

often found in decisions, in a view that might be taken thereof conveys rather too narrow an idea of the scope of opinion evidence. It may have no appreciable connection whatever with "science, art, or skill," in a technical sense, and yet be admissible just as clearly as if it possessed such connection. All opinion evidence is not expert evidence in the technical sense,. but all expert evidence is opinion evidence in any view of the matter, and all admissible opinion evidence is expert evidence in the general—the legal—sense of the term. The term "skill," as used in the quoted expression, must be regarded in its broadest signification, not applied necessarily only to mechanical or professional knowledge. It includes every subject susceptible of special and peculiar knowledge derived from experience. The term "science, art, or skill" as a limitation of expert evidence is more of a lexiconic than judicial origin. Webster defines the noun "expert" as "One who has skill,. experience, or peculiar knowledge on certain subjects of inquiry in science, art, trade, or the like; a scientific or professional witness." That strictly construed is hardly a safe guide. The law writers define the term as "a person having special knowledge and skill in the particular calling to which the inquiry relates," illustrating the same by such excerpts as these: "One who has made the subject matter of the inquiry the object of [his] particular attention and study" (*Page v. Parker,* 40 N. H. 47, 59); "A man of experience in the particular business to which the inquiry relates" (*Doster v. Brown,* 25 Ga. 24); "A skilful or experienced person; a person having skill, experience, or peculiar knowledge on certain subjects or in certain professions" (*Heald v. Thing,* 45 Me. 392), together with others more in harmony with the first quoted expression. Lawson, Expert & Opin. Evidence, 229. In 1 Wharton, Evidence (3d ed.) § 444, it is stated that expert evidence is not confined to matters involving "abstruse scientific conditions," giving numerous illustrations covering many subjects having nothing whatever to do with "science,.

art, or skill" in a scientific or professional sense. This court is in harmony therewith. It has distinctly said that any subject wherein a person may become specially learned is within the broad field of expert evidence, the question as to the subject and the special qualification in each instance to be solved by the trial court in passing on the competency of the witness, in which field, within all reasonable limitations, its judgment is to be respected. *Northern S. Co. v. Wangard,* 123 Wis. 1, 100 N. W. 1066; *Zimmer v. Fox River V. E. R. Co.* 123 Wis. 643, 101 N. W. 1099; *Hupfer v. Nat. D. Co.* 119 Wis. 417, 96 N. W. 809; *Emery v. State,* 101 Wis. 627, 648, 78 N. W. 145.

Turning now to the evidence in question and testing the same by what has been said we are unable to condemn the ruling. It was placed on the ground that in the vicinity where the cause was tried and from which the jury were drawn knowledge of the manner in which a structure made of logs would burn was common. Moreover, before the ruling was made counsel for the accused informed the court that they did. not seek to interrogate the witness as an expert. Obviously, only as such could one give opinion evidence.

Josephine Butters, testifying on behalf of the state as regards when the fire occurred, said, in effect: She woke up in the night and saw the light of a fire; that she soon discovered that it was the Klokow house; that she watched it fifteen or twenty minutes and thought the old people were burning; that soon thereafter she returned to her bed, but did not go to sleep; that it was one and a half or two hours after she saw the fire before she got up in the morning; that she arose before daylight and prepared the morning meal, and that the: family ate by lamplight. Up to that point in the witness's evidence there was no objection. This question was then asked: "How long do you think it was from the time you saw the fire to daylight in the morning?" To which answer was made, under objection: "I should think it would be three or

four hours anyway. . . . When I say daylight I mean just
the beginning of daylight." The objection to the question was
on the ground that it was too indefinite. We fail to see the
suggested indefiniteness. It may be that counsel meant that
the evidence called for was too indefinite to be worthy of con-
sideration by the jury. No explanation is furnished us in the
brief treatment of the matter by counsel. Assuming that the
objection was based on the reasons suggested, the ruling was
proper. We suppose any person of mature years and ordi-
nary experience in life may give evidence, where the matter
is material, of his estimate of the flight of time by hours or
minutes of a particular day or portion of a day during which
he was in possession of his senses, the weight thereof being for
the jury.

Error is assigned because the district attorney was per-
mitted to testify to the circumstances of his having found a
key at the Klokow place several months after the fire. It was
one of the articles which probably went through the fire and
the witness was merely called on to identify it. No reason is
suggested by counsel why the evidence was improper or why it
was prejudicial. We perceive none.

Lastly on this branch of the case error is assigned for the
refusal of the court to permit evidence by a witness as to
statements made by Mr. Klokow to the former, some over a
month before the fire, in regard to the contract. No reason
is assigned by counsel why that was material, or even the ex-
clusion of it prejudicial. It seems that it was properly ex-
cluded as mere hearsay.

A number of exceptions were taken to the court's instruc-
tions to the jury. All have been examined. We deem it un-
necessary to specially mention any except those which counsel
consider of sufficient importance to support by argument to
some extent.

The jury were instructed that the prosecution was not

called upon to prove the precise manner in which the death of the Klokows was caused. By that, in connection with other instructions, they were informed that if they were satisfied from the evidence beyond a reasonable doubt that the accused was guilty of the crime charged they should find a verdict accordingly, though they might be uncertain as to the precise criminal means by which death was reached. We discover no infirmity in that. It necessarily must follow from what has been said as to the manner of proving the *corpus delicti* that it is not necessary in such a case as this to prove the precise means by which the death was caused. A person destroys the life of another and the body is buried at sea. It is impossible to ever prove whether the death was caused by the victim being cast while alive into the sea, or whether life was taken and the body then so cast, or if the latter, whether life was taken by shooting, cutting, poison, or other means. If it were essential to make such proof in order to convict, obviously all one would have to do in order to defy efforts to punish him for criminal homicide would be to absolutely annihilate the body of his victim.

The jury were instructed that they were to inquire whether the Klokows came to their death by any other means than violence at the hands of the accused, such as by suicide, by accident, or by violence of some third person. We perceive no error in that. Certainly the jury were required to acquit the accused, if, in their judgment, there was any reasonable theory consistent with his innocence, and, under the circumstances of the case, the matters referred to were proper for consideration.

On the question of whether the fire was caused by accident the court said, substantially: The state has offered evidence as to the situation existing at the time as to the habits of the Klokows and the condition of the stoves. The defendant has offered evidence tending to show that the box stove was not in good repair; that it was cracked, and that the catch which held

the door shut was broken off. As to the theory that the fire
was accidentally caused by coals falling from the defective
stove, you are to consider the likelihood that one or both of
the Klokows would have escaped, and you are, of course, to
consider the evidence as to the finding of teeth and pieces of
what witnesses said are portions of the human skull, and the
manner in which these bones were found to be broken. If
those are fragments of a human skull, would their condition
be accounted for on the theory that they were broken into
pieces by the falling timbers? The burden of the complaint
is that the court in reciting the evidence failed to call the
jury's attention to all the evidence bearing on the subject, and
that it was prejudicial to single out some of the evidence and
give it significance by the special mention. Testing the in-
structions by the record we are unable to discover any evi-
dence of any particular importance that was not referred to.
There was no attempt on the part of the court to state all of
it or give the jury an idea that they were to determine the
matter from the evidence called particularly to their attention,
nor was there any indication that counsel called the court's
attention to omitted evidence when there was full opportunity
to do so. The court may direct in a fair manner the attention
of the jury to the obviously most significant features of the
evidence upon both sides, coupling the same with an admoni-
tion to consider the same and all of the other evidence bearing
on the question. It is not prejudicial error to do so. *Horr v.
C. W. Howard Co.* 126 Wis. 160, 105 N. W. 668. That was
what the court did in this case. After citing the attention of
the jury, as indicated in the quoted instruction, this language
was used:

"There is other evidence bearing on this question to which
it is not necessary for the court to refer. You will consider
it all. And you will understand that the court, by reference
to certain circumstances, does not intend to suggest any con-
clusion as to their effect. All the questions in the case are
for the jury."

The jury were further instructed:

"The defendant has testified to his actions and conduct on the night of the fire. You are to inquire whether this is indicative of innocence or guilt and whether it is consistent with the hypothesis that the defendant did not criminally cause the death of these parties."

"Considering the character of man the evidence discloses the defendant to be, does there appear to have been a motive to move him to commit this crime?"

"But the public, the state, has rights also. Human life is sacred and crime should be discovered and murderers punished. If the defendant has been proved guilty beyond any reasonable doubt, you will do your duty firmly and conscientiously and render a verdict of guilty."

It is suggested that the quoted language tended to convey to the jury that the trial court believed the accused to be guilty. No good reason, in fact no reason at all, is given in support of that suggestion. We cannot discover any. Those instructions seem to be fair in every respect and perfectly appropriate to the case. It is said that the last one was specially harmful, coming as it did, at the close of the instructions. Not so. It was a correct and very appropriate statement of the law, and admonition to the jury that the right of the public to have the law vindicated by the conviction of the accused, if the evidence established his guilt beyond a reasonable doubt, was equally important with the right to have it vindicated by his acquittal if guilt was not shown. It was a legitimate stimulus to the jury to perform the duty assigned to them fearlessly having regard to the public and the accused as well. The language mentioned was used in connection with this:

"You are to carefully guard the rights of the defendant. His liberty and life are dear to him and his family. If there is any reasonable doubt of his guilt, he should be acquitted."·

The foregoing covers the points presented for consideration. They do not involve any question of law not well settled by decisions of this court. The sufficiency of the evidence, both

to establish the body of the crime and the guilty knowledge of the accused, was for the jury. It is no justification for the assault on their conclusion to say, even justly, that they might have come to a different conclusion. If it were otherwise a large proportion of verdicts rendered in judicial trials would be subject to successful challenge upon appeal. Is it clear that reasonable minds could not fairly have come to the conclusion which the jury arrived at? That question must be resolved in the affirmative in order to condemn the verdict as not justified by the evidence. So, if it were conceded that the accused made in words a reasonable explanation of the incriminating circumstances which challenged response of that character, still the fact remains that the jury were permitted to disbelieve him. If it were conceded that the jury might have reasonably concluded that the house was fired by accidental means, or if not, that the accused did not do the deed, still the fact remains that under all the circumstances it was within their province to conclude that the hand of the accused did the work. The motive was present. No one else had any such motive. The opportunity was present. The time of doing the deed was aptly chosen, as the jury might well have concluded, and that the accused attempted by falsehood to deny that fact. His conduct after the fire, as the jury might well have viewed the matter, was utterly inconsistent with any reasonable theory of innocence. While one so circumstanced would have shown the greatest anxiety to solve the question of whether the remains of the disappeared were in the ruins, the accused showed the utmost reluctance in that regard and even went to the length, as the jury probably and justifiably concluded, to discourage search by suggesting falsely that he believed the old people went to a distant point, mentioned, on the night before the fire. It may be that some reasonable minds might have viewed the evidence as a whole as weak, and far too much so to warrant the verdict rendered, yet the fact remains that other reasonable minds might well have

come to the conclusion that the evidence unmistakably pointed
to the truth of the matter in harmony with the verdict; that
all the incriminating circumstances were established beyond
a reasonable doubt, and all pointed to the fact of guilt, and
were all inconsistent with any other reasonable theory.   So
no other conclusion can be reached but that justice has been
done, so far as it is given to human tribunals to determine the
matter.

*By the Court.*—The judgment is affirmed.