SPICK, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 15—June 3, 1909.*

*Criminal law and practice: Jurors: Conscientious scruples: Circum-
stantial evidence: Instructions to jury: Evidence: Weight: Com-
petency: Questions for court and for jury: Harmless errors:
Homicide: Motive: Informer as to other offense by accused:
Hearsay: Impeachment of witness: Rejection of his testimony
by jury: Presumption of innocence: Degrees of murder: In-
structions as to importance of agreeing on verdict.*

1. A person called as a juror who discloses on the *voir dire* con-
   scientious scruples against rendering a verdict on circumstan-
   tial evidence alone, may properly be rejected as incompetent,
   with or without objection by counsel.
2. While it would be well to specially instruct a jury on the sub-
   ject of circumstantial evidence where the truth of a contro-
   versy is to be discovered partly or wholly from such evidence,
   omission to do so is not fatal error unless proper instructions
   in respect thereto are presented and rejected.
3. The rejection of evidence offered to prove that a person other
   than the accused committed the particular homicide in ques-
   tion is not harmful error, where it is manifest from the whole
   evidence that such person was in no way connected with the
   offense, in that he was not in the vicinity of the place thereof
   at the time of the occurrence.
4. Circumstantial evidence is an instrumentality in the adminis-
   tration of justice quite as legitimate as direct evidence for the
   establishment of an evidentiary circumstance, or the main fact
   in controversy in a judicial trial.
5. The degree of certainty respecting the existence of the main
   fact in controversy in a judicial trial, in order to warrant a
   finding in favor of the party affirming such existence, is the
   same where the evidence relied upon is partly or wholly cir-
   cumstantial as where it is direct.
6. The weight of evidence to establish an evidentiary circumstance,
   and the weight of such circumstance as evidence when estab-
   lished, is for the jury.
7. Whether evidence offered tends to establish an evidentiary cir-
   cumstance, or such circumstance to establish the main fact in
   controversy, is a question for the court. The decision in that
   regard, being in the field of mere competency, should not be
   disturbed on appeal unless manifestly wrong, the matter to be

viewed having regard to the superior advantages of the trial over the reviewing court for determining such question.

8. In case the evidence, whether wholly circumstantial or not, produces a conviction to a moral certainty—that is, beyond a reasonable doubt—in the minds of the jury of the existence of the ultimate fact in controversy, a verdict is due accordingly the same as if conviction with like degree of certainty were produced by direct evidence.

9. It is proper, though not necessary, in instructing a jury in a criminal case, where conviction is dependent partly or wholly on circumstantial evidence, to use this language or something similar: The accused is entitled to an acquittal unless the evidence satisfies' the jury to a moral certainty of the existence of all the material circumstances; that they are consistent with guilt and inconsistent with any other reasonable hypothesis.

10. In a criminal case it is sufficient to instruct the jury in any appropriate language, as to the degree of certainty of guilt requisite to a conviction, to the effect that: In order to warrant a conviction each and all of the material circumstances and the fact of guilt should be established to the satisfaction of the jury beyond every reasonable doubt.

11. Proof of motive is not essential to a conviction in a prosecution of a person upon a charge of his having committed a criminal offense, but circumstantially it is of more or less weight as to the material fact according to the nature of the situation; and in a case resting wholly upon circumstantial evidence the presence or absence of motive may well be the deciding factor.

12. In a prosecution for a criminal homicide dependent upon circumstantial evidence, as bearing on the question of motive of the accused for doing the deed of which he is accused, it is competent to show that prior to the homicide the deceased reported that the accused had, to his knowledge, committed another offense, in the absence of any direct evidence that the accused knew who was the informant, if, from all the circumstances, it is reasonably inferable that he did know in fact, or had good reason to believe and did believe, the deceased to be his accuser; consideration of such evidence to be dependent upon belief of the jury that the defendant did, in fact, know or believe before the homicide that the deceased was the informer.

13. In case a decision by a trial court on the question of competency when made was wrong, but is right viewed from the standpoint of the whole evidence at the close of the trial, the error is harmless.

14. A jury may be instructed that the evidence on the part of the state tends to establish its claim and that on the part of the defendant the contrary, it being made plain that the real right of the matter is wholly for them to determine from all the evidence produced.

15. A witness may be impeached by proving by the evidence of other witnesses that his evidence is false; also by proving he has made statements out of court inconsistent with those made under oath in court. But a jury should not be instructed that if they believe from all the evidence that the testimony of any witness is false they may reject it, as if they had discretion whether to reject or not reject such evidence, nor be instructed that whether to reject such evidence or not is conditioned upon whether the same is corroborated by other credible evidence.

16. Belief upon the whole evidence that the testimony of any witness is false precludes the existence of its being corroborated by any credible evidence so as to be entitled to be believed. Any suggestion to the contrary involves absurdity and is to be avoided because of danger of the subject being confused with the rule of *falsus in uno, falsus in omnibus.*

17. If the jury believe that any witness has wilfully testified falsely respecting any material matter, they may, if they see fit, but are not bound to, reject all of such witness's evidence on that ground alone, where not corroborated by some other credible evidence.

18. A person on trial, charged with having committed a criminal offense, is presumed to be innocent; and such presumption entitles him to an acquittal till overcome by evidence establishing his guilt to the satisfaction of the jury beyond a reasonable doubt.

19. In case of a criminal homicide manifestly committed by an act imminently dangerous to human life, and indicative of depravity of mind and disregard of human life, so characterized as to show the grade of the offense to be murder in the first or second degree, any circumstance sufficient, reasonably, to at least cause reasonable doubt as to whether the act was pursuant to a formed design to take human life, warrants finding a verdict of guilty of murder in the second degree.

20. In case of belief from the evidence beyond a reasonable doubt that the accused is guilty of the offense of criminal homicide in either the first or second degree, but there is reasonable uncertainty between the two degrees, though belief of guilt of the offense at least in the second degree, a verdict of guilty in such degree is proper.

21. A jury may properly be admonished of the importance of agreeing upon a verdict and told, if such appears reasonably to the

trial judge to be the situation, that the evidence is not so vo-
luminous or hard to understand, but that a conclusion can be
reached one way or the other within a reasonable time, and
that such result is expected, care being taken not to suggest
which way is proper or to go further than to stimulate appre-
ciation of jury duty.

[Syllabus by MARSHALL, J.]

DODGE, J., and WINSLOW, C. J., dissenting, are of the opinion
that it was prejudicial error in this case to admit evidence that
the deceased had reported to a third person that the accused.
had committed another offense (see par. 12, *supra*),—such evi-
dence being pure hearsay and there being no other evidence.
that the accused had committed such other offense and no evi-
dence warranting an inference that he knew or suspected that.
the deceased had given such information.

ERROR to review a judgment of the circuit court for Bay-
field county: JOHN K. PARISH, Circuit Judge.   *Affirmed.*

The plaintiff in error was informed against as having, on
the 28th day of August in the year 1907, at the county of
Bayfield, in the state of Wisconsin, feloniously, wilfully, and
with his malice aforethought, killed and murdered Boni Lom-
bard.   He was in due form tried on such charge, found guilty
of murder in the second degree, and duly sentenced to be pun-
ished by confinement at hard labor in the state prison at
Waupun for the period of twenty years, the first day of such
period to be solitary confinement.

A writ of error was, in due form, sued out to review the
case on exceptions duly saved.   The facts are stated in the
opinion.

*John Walsh,* for the plaintiff in error.

For the defendant in error there was a brief by the *Attor-
ney General* and *J. E. Messerschmidt,* assistant attorney gen-
eral, and oral argument by *Mr. Messerschmidt.*

MARSHALL, J.   The place of the homicide was in a sparsely
settled wild country in which the plaintiff in error and the
deceased lived.   The latter was the sole occupant of a home-
stead claim, called the Morrison homestead, about a mile and

.a half from the nearest neighbor. He did a little farming, but spent his time, mainly, in hunting and fishing and enter- taining persons who resorted to that region for the purpose of fishing. The deceased resided with his employer, one Barnes, who lived about a mile and a half from the Morrison homestead and did a farming, lumbering, saloon, and general store business. There were only three other persons, all homesteaders, living in that locality. Barnes had been ac- quainted with the deceased for about nineteen or twenty years, and during the two years prior to the homicide had em- ployed him as a foreman in the woods and as a farm hand. The accused and the deceased were addicted to drinking in- toxicating liquor somewhat to excess, though the habits of the latter in that regard were not so pronounced for a short time before the homicide as formerly. He and the accused were well acquainted. The latter had been in disrepute with Barnes and the deceased for a considerable time before the homicide. Some incidents had recently occurred which in- creased the bad repute, particularly the fact that Barnes had lost cattle and it had been reported to him that the accused had killed and made away with them. The accused dis- trained one of the cattle because of its trespassing upon his premises, and Barnes compelled him to release the animal. The deceased was partly of Indian blood. There were a num- ber of that blood who lived not far away and some were ac- customed to work for Barnes under the direction of the de- ceased. For some days before the homicide the deceased had charge of a crew of Indians putting up hay for Barnes at a point where, in going thereto and returning therefrom, by the shortest and usual route, he had to pass the place where the accused lived. The day before the homicide the latter, the accused, and two others went fishing on a lake, using a boat. They had liquor along and the accused drank to such excess that he fell out of the boat into the water. About 4 o'clock in the afternoon his associates took him home, changed

his clothes, and put him to bed.    The deceased was last seen alive going in the direction of the Morrison homestead about 6 o'clock on the following morning.    Between 3 and 4 o'clock in the afternoon of that day the accused visited the Barnes place and reported that Lombard had been killed.    He stayed there until 6 o'clock and in the meantime drank to excess. He bought some groceries and started home with them in a sack.    Later he was found lying beside the road in a drunken stupor about a mile from his destination and was assisted to regain his feet and accompanied home.    To the person who assisted him to his feet he remarked, "I was just as liable to lay there as I did with Boni."    In the meantime, two men went from Barnes's place to investigate the report as to the death of Lombard and found his body in the road about forty feet from the Morrison house.    A bullet from a rifle had passed through his upper right side, apparently killing him almost instantly.    There was a trail of blood from the body for a distance of seventy to eighty feet to a pile of lumber just outside a window, near the southwest corner of the house, at which point there was evidence of considerable blood having been lost, and there was a whisky jug belonging to the accused, marked with blood and dirt.    There were indications that a rifle shot had recently passed through the wire screen in the window, fired from inside the house in the direction of the place where it seemed the deceased was when shot.    On the bed in the house lay defendant's rifle, with indications that it had recently been discharged.    A rifle belonging to the deceased, of the same caliber as the other, was found a short distance from where he was apparently shot, but there were no indications that it had been recently discharged.    The jug was full of whisky and in the house on the morning of the homicide.    When found it was nearly empty.    There was evidence establishing without controversy, or tending to establish, all these circumstances and others of a more or less incriminating nature, including some statements of the

accused, from which it was inferable that he was the guilty party, while there was other evidence from which it was claimed it was inferable that some other person did the deed. The accused after returning home drunk, as before stated, on the day of the homicide remained there till the next morning sleeping off his debauch. In the meantime several persons, attracted to the place by the report of the homicide, were about the premises, including the two men who first went to investigate the matter. They remained watching the body till the next morning, when there was a coroner's inquest and it was removed.

The story of the accused was, that upon waking up after sleeping off his debauch of the day before the homicide, he went on a fishing trip of several miles and at his destination used a particular boat; that he returned in the afternoon about 1 o'clock and, upon finding the body of the deceased in the road, put down his sack of fish at the side of the house and went to the Barnes place and reported the fact. There was circumstantial evidence that his story was false, such as there being no sack of fish found at the side of the house by any one attracted to the place by the report of the homicide before the accused returned from the Barnes place, and the boat he claimed to have used on the fishing trip not having been disturbed on the day of the homicide.

Several errors are assigned, not argued in the brief of counsel for the accused, though some of them were mentioned incidentally, or argued briefly, on the oral argument. We will pass them with this mention thereof and with the statement that they have received sufficient attention to satisfy the court that neither of them is material.

The court properly sustained a challenge of a juror because he testified to having conscientious scruples against convicting a person of a capital offense on circumstantial evidence alone. Such a person is manifestly incompetent for jury duty. By the law of the land, which every citizen is bound

to support, and every juror before being competent to sit in a case is so specially bound by his solemn oath, it is as legitimate to judicially establish a fact by circumstantial as by direct evidence, and it is as much the duty of a juror to act according to the weight of the former as to act according to the weight of the latter. A person might as well say, generally, he has conscientious scruples against obeying the law of his country as to say he has such scruples against acting as a juror upon circumstantial evidence in a capital case. Such a person has too much conscience, so to speak, for the best of citizenship. More properly speaking, he has that species of conscience with that grade of weakness that often makes the coward mistake his timidity for that conscience which is worthy of distinction.

It is suggested that in view of something said or decided in *Kollock v. State,* 88 Wis. 663, 60 N. W. 817, the court committed error by not instructing the jury on the subject of circumstantial evidence, though no request was made in that regard. We do not find anything in that case so holding. The difficulty there was that the trial court not only omitted to give any instructions in the general charge, specially on the subject of circumstantial evidence, but refused to give instructions embodying correct legal principles in respect to the matter, requested by counsel for accused. While it would be well to give such instructions in any case like this, it is a matter so largely within the discretion of the trial judge that omission to do so cannot be regarded as ground for reversal, unless the omission is in face of a proper request for such instructions.

One Beauregard was called as a witness for the state to prove that he found the accused in a drunken stupor beside the road where, as before stated, he had fallen or lain down while returning from the Barnes place after having been there and reported the homicide. An attempt was made on cross-examination to show he had ill will toward the deceased and had

threatened to kill him, as bearing on the probability that he, instead of the accused, was the guilty party. The offer was not made as bearing on his credibility, but as direct evidence of motive for taking Lombard's life. , The questions were ruled out as not proper cross-examination. If the ruling were improper, and we do not suggest it was not, it was harmless, since there was positive undisputed proof that the witness was at work some over a mile from the place of the homicide when it occurred.

· The claim is made that the evidence being all circumstantial, and there being indications that some other person than the accused might have committed the homicide, the jury were not warranted in finding the circumstances pointed so strongly to the accused as the one who did the deed, as to exclude every reasonable hypothesis to the contrary. We shall not take time to go over the evidence in detail. It has been stated in a general way and sufficiently for the purpose of this assignment of error.

True, it was improper to convict the accused unless the evidence established the material evidentiary circumstances beyond a reasonable doubt, and all such circumstances pointed so unerringly to the accused as the guilty party as not to be reasonably reconcilable upon any other reasonable theory than that of his guilt. But the degree of certainty in such a case is no greater than in one resting wholly upon direct, or partly upon direct and partly upon circumstantial evidence. The subject was discussed at considerable length in *Schwantes v. State,* 127 Wis. 160, 106 N. W. 237, where occasion was improved for correcting the erroneous notion that circumstantial evidence should be viewed with such distrust as to be inefficient in face of mere conjecture or possibility of incorrectness of its indications, upon the theory that to be efficient it must establish guilt with some appreciably higher degree of certainty than direct evidence. Experience shows that the former is quite, if not more likely, to lead to a wrong result than the latter.

An eminent commentator on the criminal law, speaking on this subject, very aptly thus pictures the misunderstanding sometimes found to exist:

"Much embarrassment has arisen over the position advanced by two eminent text-writers, that, to justify the inference of legal guilt from *circumstantial* evidence, the existence of inculpatory facts must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt. Judges, on hearing these expressions, have been very apt, in the hurry of a trial, to accept and apply them; and hence have sprung up a series of *dicta* to the effect that circumstantial evidence is to be viewed with distrust, and that, to justify a conviction on circumstantial evidence, it is necessary to exclude every possible hypothesis of innocence." Whart. Crim. Ev. (9th ed.) § 10.

Speaking on the same subject, said WHITMAN, C. J., in *In re Thorn,* 6 Law Rep. 49, 54: "Circumstantial evidence is often stronger and more satisfactory than direct, because it is not liable to delusion or fraud."

And GIBSON, C. J., in *Comm. v. Harman,* 4 Pa. St. 269, 271:

"Circumstantial evidence is, in the *abstract,* nearly, though perhaps not altogether, as strong as positive evidence; in the *concrete* it may be infinitely stronger. A fact positively sworn to by a single eye-witness of blemished character is not so satisfactorily proved as is a fact which is the necessary consequence of a chain of other facts sworn to by many witnesses of undoubted credibility."

We repeat the summing up in the *Schwantes Case,* 127 Wis. 160, 177, 106 N. W. 237, 243:

"Evidentiary facts established by evidence more or less direct pointing logically to the ultimate subject of search, have always been, and must necessarily always be, essential instruments in the administration of justice, and when established as they all should be, with the same degree of certainty as the ultimate fact is required to be established, they do not fall below, in probative force, direct evidence. One is as competent

as the other to prove the real subject matter of the inquiry. From such evidentiary facts we reason inductively.   Certain *indicia* are known by experience to characterize human actions.   Those concomitant with any particular act being ascertained with the degree of certainty required as to the main fact, the latter, we reason logically, must necessarily exist also.   Such process of reasoning goes to the ultimate point of inquiry with well-nigh, if not quite, the certainty of exact demonstration.   We first conjecture that the subject of search exists and is discoverable.   We prove its concomitant facts according to human experience and by the illumination thus produced we dissolve the mist characterizing the conjecture and bring into definite outlines that which was before hidden. *People v. Kennedy,* 32 N. Y. 141.   If the picture thus disclosed to our view is the only one that can reasonably exist under the circumstances we stamp it, so to speak, as the truth of the matter to a moral certainty—the highest degree of certainty attainable in human affairs.   *People v. Harris,* 136 N. Y. 423, 429, 33 N. E. 65.   So it is said that 'certain laws of moral conduct operate almost as infallibly as the mechanical laws of the material world.' "

Courts, very properly, in giving instructions in cases of this sort, say commonly, substantially:

You should not render a verdict of guilty unless after a careful consideration of all the evidence in every reasonable aspect, each material circumstance is established beyond a reasonable doubt and they are unexplainable upon any reasonable hypothesis other than that the accused is guilty; in other words, unless all material circumstances are consistent with his guilt, establishing it with such high degree of certainty as to exclude any reasonable theory that any other person did the deed.

Thus enlarging on the subject is not to be regarded as a requirement because of any specially inherent infirmity in circumstantial evidence, but as indicating the care which it is appropriate and quite becoming for the judge to exercise in presiding upon so grave an occasion; as a method of emphasizing the rule that an accused is entitled to go free un-

less his guilt is established beyond a reasonable doubt, and of admonishing the jury, on account of the very serious nature of the consequences that might otherwise follow, to proceed with great consideration and care, avoiding so far as practicable all possible danger of giving way at any point to mere suspicion. After all said, the degree of certainty required is covered by admonishing the jury that the accused is entitled to an acquittal unless guilt is established to their satisfaction beyond any reasonable doubt.

Applying the foregoing to the evidence, it is the opinion of the court that the incriminating circumstances which the evidence tended to establish sufficiently to make the existence or nonexistence of each of them a jury question, i. e. sufficiently to render it competent for the jury to find as to each in favor of the state beyond a reasonable doubt, made a network around the accused so complete as to justify the jury in finding that it singled him out as the only person concerned, criminally, in the homicide and the one who committed it beyond any reasonable doubt.

Barnes was permitted to testify that the deceased told him the accused killed his cattle and that, subsequently and before the homicide, he told the accused he had been so informed, but did not tell him who imparted the information. There was no direct evidence that the accused, previous to the homicide, knew the deceased was the informant. The evidence was permitted to go to the jury, with all the other evidence in the case bearing on the question of whether there was any ill feeling between the accused and the deceased, furnishing any motive for the former to do the deed of which he was accused. In connection with the evidence there was the circumstance that the deceased was Barnes's foreman—the one most likely to have investigated respecting the loss of the cattle and to have aroused Barnes's suspicion of the accused, if he did not convey direct information to him, that the latter was the suspected party, and, further, the circumstance that

the deceased was so circumstanced that the accused when informed by Barnes, as aforesaid, quite likely knew, or strongly suspected, that the informant was the deceased, and the further circumstance, which the jury had a right to believe from the evidence existed, that the deceased and the accused had serious trouble shortly before the homicide, trouble that moved the latter to declare, in effect, a few days after the homicide that the deceased deserved what he got. There was the further circumstance of absence of any reasonable explanation of such intense feeling of the accused towards the deceased as to cause him to use such expressions other than knowledge or belief on his part that the deceased had become possessed of the secret as to who killed the cattle and had imparted it to Barnes. It was in view of the whole situation, including what has been detailed and other evidentiary suggestive circumstances bearing on the question of whether the accused before the homicide knew, or had good reason to and did believe, that the accused was Barnes's informant, that the evidence was permitted. It was offered and received, not as evidence that the accused killed the cattle, but that he had been accused by the deceased of having done so, and, therefore, had a motive for the homicide. That was made abundantly plain to the jury at the time the evidence was received and was emphasized by what occurred during the argument to the jury.

The district attorney in the course of his address argued that circumstances indicated that the accused knew before the homicide that the deceased, and only he, was in possession of the secret about the shooting of the cattle. That was objected to, whereupon the district attorney conceded there was no direct evidence to that effect, but insisted that it was a legitimate deduction to make from the whole evidence that he in fact did know of it, and that the trouble between him and the deceased, some time before the homicide, resulted therefrom. With that explanation the court said, in effect, that he would permit such theory to be argued to the jury. Thus they must

have understood, from the district attorney, and the court as well, that whether the evidence complained of was entitled to any weight as bearing on the question of motive depended on whether, from all the circumstances, they concluded that the accused knew or suspected who had informed on him.

It was certainly competent to show motive of the accused for the homicide. Motive is not essential in such a case, but presence or absence of it is an evidentiary circumstance bearing, with more or less weight according to circumstances, on the question of guilt. In a case resting, as this does, wholly on circumstantial evidence, presence or absence of motive may well be the deciding factor. So if the evidence in question was improper, it was manifestly prejudicially so.

It being proper for the state to show motive for the homicide and by circumstantial evidence, would not the fact, if it be a fact, that the accused killed the cattle and to his knowledge the deceased knew and had informed Barnes of it, or the fact, if it be a fact, that the accused knew the deceased believed and had reported to Barnes that he killed the cattle, particularly by reason of the character of the accused and the debauchery immediately preceding the homicide, afford some reasonable explanation of how he might either have conceived the idea of killing the deceased and lay in wait for him where he could safely and surely accomplish the homicidal purpose by shooting from the inside of the house through the screen at the open window, or had some altercation with him about the cattle, preceding or during which the jug of whisky played a part and was partly emptied by both, or by the accused and, following that, after the deceased left the house and proceeded a little distance might have fired at him through the screen at the open window or in some other way, being so intoxicated as not to have a definitely formed design to kill, have done the fatal deed.

In the situation stated the question presented to the court on the objection to the evidence was one of competency. In

other words, to determine whether the evidence complained of, under all the circumstances, tended, reasonably, to show that the accused knew before the homicide that the deceased was the one who had informed on him, or believed he was the one. If so, whether the evidence was sufficient to so show, was for the jury. If it bore legitimately, in any reasonable view of it, on the question, it was within the field of competency. That is one of the most difficult situations, in many cases, which a trial court has to deal with. It involves a question of fact and permits of a very wide range of judgment, reaching to the very boundaries of reason. Hence the rule that the decision of a trial court on such a question cannot properly be held wrong on appeal unless it is clearly so, and whether it is or is not, is to be determined in face of the fact that a trial judge, ordinarily, is in a much better position than an appellate court to decide such a matter. It is manifest that error in such a ruling must appear very plainly from the written history of the trial to warrant holding that error was in fact committed. This court has often so held. *Emery v. State,* 101 Wis. 627, 648, 78 N. W. 145; *Hupfer v. Nat. D. Co.* 119 Wis. 417, 427, 96 N. W. 809; *Kavanaugh v. Wausau,* 120 Wis. 611, 618, 98 N. W. 550, 553

In the last case cited the court said:

"The question of competency respecting evidence is always one of law to be solved by the court." It might well have been said in connection therewith, underlying it, however, is the question of fact as to whether the evidence, if admitted, will tend to prove a fact in issue, or any evidentiary fact. "If the test to be applied in determining the first question was whether the evidence, if true, would in the mind of the trial judge establish the fact in controversy, it is obvious that the court, in ruling thereon, would often be called upon to determine questions of credibility and weight. Such is not the test. If evidence, in the judgment of the trial court, if true, will tend within reasonable probabilities to establish the matter in dispute according to the claim of the party of-

fering it, and there is a reasonable probability of the truthfulness thereof, the true test of competency is satisfied and the evidence should be admitted. . . . The court's decision in such matter, following the proper test, is regarded as a verity unless manifestly wrong. . . ."

From what has been said it is evident that the learned circuit judge, in admitting the evidence in question, applied the proper test. Precedent to the ruling he determined, considerately, in view of all the circumstances, the matter of fact involved in favor of the state, which required him to rule, as matter of law, to admit the evidence. Was the ruling on the matter of fact wrong, especially in view of the whole evidence as it stood when the case was submitted to the jury? If it were true that the circumstances were not sufficient at the time the ruling was made,—were not sufficient to warrant, reasonably, the belief that the accused knew before the homicide, the deceased was the one who had charged him with killing the cattle, but before the case closed the circumstances developed were sufficient,—the vice of the ruling was effaced.

After a careful consideration of the case in all its bearings it is the opinion of the court that the trial judge did not, manifestly, commit error in admitting the evidence complained of. It was not necessary to show by direct evidence knowledge of the defendant that the deceased was his accuser. It was as competent to prove that by circumstantial evidence as it was to thus prove any other evidentiary circumstance or the main fact.

It is not often easy to refer to judicial authority supporting a situation which is somewhat uncommon, but that does not, legitimately, suggest doubt as to its propriety where the principles involved are plain. Cases show merely application of principles. New combinations of circumstances call for new applications of old principles and result in the creation of new precedents. If courts were to feel lost as to what to do when out of sight of precedents they would be quite in-

efficient to satisfy fully their great function as administrators of justice.

The case cited to our attention by the attorney general, *People v. Chin Hane,* 108 Cal. 597, 41 Pac. 697, is a very clear illustration of the principles we have discussed. It is on all-fours with this case. For the purpose of showing motive for the homicide, evidence was received, over objection, that the deceased went upon the bond of a third person who had been charged by the accused with having attempted to murder him. The ground of the objection was that there was no evidence that the accused knew, prior to the homicide, that the deceased was instrumental in his assailant's regaining his liberty after being arrested on the charge of attempted murder. The court, on appeal, said:

"The objection, we think, goes to the weight of the evidence, rather than to its competency. We think it fairly inferable from all the facts and circumstances that he was possessed of such information, but, if he had no knowledge of the fact, then the evidence was entirely harmless, and no injury to him could have possibly resulted from its admission."

We may well assume that, in making the last remark, the cause was submitted, as it was here, so the jury must have understood that the test of whether the evidence complained of was to be considered, was whether they believed, from all the circumstances bearing on the question, that the accused knew, before the homicide, of the act of the deceased which was offensive to him.

The learned circuit judge said to the jury:

"The evidence of the state tends to prove that defendant is guilty of murder in the first degree." But in connection therewith the court said: "The evidence of the defendant tends to prove he is not guilty. You must arrive at the truth from the evidence, and you will be governed by the evidence alone, in deciding the case. Your especial duty as jurors is to arrive at the truth from the evidence."

And also said:

"Certain evidence has been introduced here tending to prove that certain alleged admissions have been made." But also said in connection therewith: "The rule as to admissions or confessions is, that such evidence is the weakest kind of evidence and that such evidence, if taken at all by the jury, should be taken with great caution; but if the jury is satisfied that admissions have been actually made, then they should give such evidence the weight, when they consider the whole evidence, that they believe they should receive."

Counsel for the accused selected out of the charge the opening statement on each subject and in that way suggested that prejudicial errors were committed. We see no reason for the claim of counsel that the court gave undue prominence to the evidence against the accused over that in his favor or intimated to the jury, in the slightest degree, what weight they should give to any of the evidence. There is nothing in the instruction within the condemnation of anything said in *Ferguson v. Truax,* 132 Wis. 478, 491, 110 N. W. 395, 111 N. W. 657, 112 N. W. 513, or *Till v. State,* 132 Wis. 242, 248, 111 N. W. 1109.

There may be a difference of opinion as to the best way to refer to the fact that there is evidence to carry the question involved in such a case to the jury, and whether it is best to specifically refer to it at all. But, certainly, any man of sufficient intelligence to perform, properly, jury duty must know, in case of submission to him to find facts from conflicting evidence and inferences therefrom, that in one aspect it is supposed such evidence will admit of a finding one way and in another in a different way. Otherwise there would be no jury question to be solved. It is a common way for a trial judge to say, in terms or effect, there is evidence tending to support the claim of one side and evidence tending to support the claim of the other; it is your particular duty to reconcile the conflict and find the truth. And, certainly, there is at least no harmful error in such common method of

submitting a cause, though the way of stating the matter best calculated to avoid giving the jury any idea of a judicial purpose to intimate what weight should be given to the evidence upon either side of any controverted matter admits of considerable difference of opinion.    In that field trial judges do, and should, have a large measure of discretion.

The second part of the instruction above quoted, if faulty at all, is too favorable to the accused.    We will not discuss that part of the charge but leave it by saying that, perhaps, the trial judge was a little overcautious in favor of the accused in some of the language used.    It is not thought best to pass it with such approval as to suggest use of the same language in the same or similar circumstances.

The jury were instructed thus:

"(1) A witness may be impeached by proving that the testimony that he has given is false, or he may be impeached by proving that he has made statements on material facts different from what he has sworn to in court.    (2) You should not reject the testimony of any witness, without due consideration and reasonable grounds therefor.    (3) It is your duty to consider the interest of the defendant, or any other witness, if you find that any other witness is interested in fact, in the result of this trial, as going to the credibility of such witnesses.    (4) If you should find, when you consider the whole evidence, that the testimony of any witness is false, it may be your duty to reject the testimony of such witness, unless it is corroborated by some credible evidence."

In addition to this and entirely separate from it the court gave correctly the rule on the subject of *falsus in uno, falsus in omnibus.*

It is strenuously argued that the first period, which was segregated from its context for the purpose of an exception, is erroneous and condemned in *Colbert v. State,* 125 Wis. 423, 104 N. W. 61.    We fail to find any such instruction in that case.    The one condemned was entirely different. The one here is the same as was given in *Miller v. State,* 139

Wis. 57, 119 N. W. 850. We advise against using language
so liable to be challenged as erroneous. It was not given in
this case and was not in the former with intent to state the
rule of *falsus in uno, falsus in omnibus,* for that was given,
as before indicated, in another and quite different part of
the charge.

True, a witness may be impeached by proving that his tes-
timony is false. A jury need not be told that; it is so self-
evident. True, also, a witness may be impeached by proving
statements made by him out of court are inconsistent or con-
tradictory of those made under oath in court. Those methods.
of impeachment are laid down in all elementary works on
evidence. Jones, Ev. § 847; Greenl. Ev. § 461; Taylor, Ev.
§ 1470. So that part of the charge excepted to, by itself, is.
faultless. But why was it followed by the statement, "If
you find, when you consider the whole evidence, that the tes-
timony of any witness is false, it *may* be your duty to reject
the testimony of such witness, unless it is corroborated by
some credible evidence?" Why was it suggested to the jury
that they had discretion whether to reject or give weight to.
testimony believed by them to be false? Of course, they
must reject such testimony. And why was feasibility of cor-
roborating utterly false testimony by credible evidence so as
to render the former worthy of being given credence in dis-
covering the truth, suggested? As said in the *Miller Case,*
rejection of testimony of a witness believed to be false does
not fall within the principle as to permissible rejection of
all of a witness's evidence because of some material part of
it being wilfully false. The improper use of the word "may"
and the improper addition of the words respecting corrobora-
tion, led counsel to conclude here, as it did before, that the
language of the court was an erroneous statement of the rule
of *falsus in uno, falsus in omnibus.* The improper addition
made the whole involved in such absurdity, as said in the
*Miller Case,* that no sensible juror could reasonably have

been misled by it. The very existence of testimony believed upon a consideration of the whole evidence to be untrue, excludes, utterly, any possibility of there being corroborating evidence entitling the false evidence to credence. The fabled Cassio, in his misfortune, though uncertain which was his right and which was his left hand, yet appreciated that neither could be both.

The jury were instructed that:

"The burden of proof rests upon the state from the beginning to the end of the trial, and defendant, when placed upon his trial, was presumed to be innocent."

We see no error in that. The better way is to say, in connection with what was said: Such presumption continues from the beginning to the end of the trial and entitles the accused to an acquittal, unless overcome by evidence establishing his guilt, to the satisfaction of the jury beyond a reasonable doubt. *Emery v. State,* 101 Wis. 627, 78 N. W. 145.

But the language used seems to mean that, with sufficient clearness to leave the accused without reason to complain, since no more plainly worded rule was requested.

It is urged that in no event can the conviction properly stand because the accused was, manifestly, guilty of murder in the first degree or not guilty; that there is no reasonable ground in the evidence for belief in a killing by the accused without design to produce that result. The border line between murder in the first degree and murder in the second degree is very plain in statutory characterization, but whether it is one or the other is often very difficult of determination on the evidence. So it has been said that if the jury, in any given case, conclude from the evidence that the accused is guilty beyond a reasonable doubt of either one or the other of two offenses, and they are not wholly convinced that it is the greater, they should find a verdict of guilty of the lesser. *Ryan v. State,* 115 Wis. 488, 92 N. W. 271; *Miller v. State,* 139 Wis. 57, 81, 119 N. W. 850, 860.

To warrant the jury in rendering the verdict they should have come to the conclusion upon evidence rendering such conclusion reasonable that there was at least a reasonable doubt as to whether the accused was guilty of the highest homicidal offense, but none as to whether he committed an act imminently dangerous to the deceased, causing his death, evincing a depraved mind regardless of human life without any premeditated design to. effect such result. Sec. 4339, Stats. (1898). There were some circumstances in this case, seemingly within reason, satisfying that test. Manifestly, there was the act imminently dangerous to the deceased. There was plenty of evidence of depravity of mind and disregardfulness of human life. There was proof of the long debauch, tending to show a condition of inability to form, or improbability that there was formed, any specific design to take Lombard's life. There was no evidence of any very adequate motive to move a man, even one of as low degree and depraved by liquor as the accused was, to form a wicked design to take human life. The presence of the jug, which was full of whisky. in the morning, but out of doors nearly empty immediately after the homicide, with some indications that it was in possession of the deceased at the time he was shot, or that it was in contact with him immediately afterward, is not without its significance. There is such a dense mystery as to just what occurred at the time of the homicide—as to the real characteristics of it,—including the events immediately preceding the fatal shot, that one might hesitate to say death was, beyond a reasonable doubt, effected pursuant to a premeditated design to kill. May not the jury reasonably have entertained from the evidence a fair doubt on that question? Their answer as to that was approved by the learned trial judge. It requires a strong case, made wholly by a written history of a trial, to warrant an appellate court in overruling such a decision. It is the opinion of the court that no such strong case appears here.

The following cases sufficiently point to the last conclusion,

if any support by way of judicial precedents is required: *Clifford v. State,* 58 Wis. 477, 17 N. W. 304; *Flynn v. State,* 97 Wis. 44, 72 N. W. 373; *Odette v. State,* 90 Wis. 258, 62 N. W. 1054; *Eckert v. State,* 114 Wis. 160, 89 N. W. 826; *Johnson v. State,* 129 Wis. 146, 108 N. W. 55. It would seem that there was more shadowy ground in each of such cases for believing the accused was guilty of murder in the second instead of murder in the first degree than in this. In each death was caused by one or more bullets being fired into a vital part of the body under circumstances indicating some provocation and some circumstances reasonably causing doubt as to whether the shot was fired pursuant to a formed design to effect death, and impairing the presumption of such design springing from intentional discharge of the firearm aimed at such vital part.

The next day after the case was submitted to the jury they requested further instructions and pursuant thereto the court instructed them at length to the effect that, commonly, the prosecution, and the defense as well, in the trial of a case have to resort to circumstantial evidence; that it is a legitimate method of establishing the truth; that justice could not be otherwise administered; and further instructed them as to the scope of the term "beyond a reasonable doubt," and said:

"The evidence which you are compelled to pass upon is not so complicated and so voluminous and difficult to understand that a jury should not arrive at the truth within a reasonable time."

"I can see no reason, gentlemen, why you should not agree upon a verdict in this case, and we expect you to do so."

"The real question for you to determine in this case is, what is in fact the truth."

It is argued that the quoted language contained a pretty plain intimation that the evidence tended strongly to establish the guilt of the accused and to impress the jury that they were under some measure of coercion to find a verdict accordingly, and to do so without much further delay. The

opinion here is otherwise. True, as the learned judge said, the evidence was not voluminous, nor very difficult to understand. That was manifest to the commonest understanding. But the inferences that might be legitimately drawn therefrom were left to the jury with scrupulous care. True, also, it was manifest that there was no very good reason why the jury should not reach a conclusion within a reasonable time. No suggestion was made to them that they had deliberated an unreasonable time or how much additional time would be reasonable before coming to a conclusion one way or the other. That was left wholly to them.

It is not infrequent that jurors fail to fully realize their high duty to reason with each other, to compare opinions, and to each be considerate of the views of his fellows, leading to undue hesitation in reaching a verdict or failure to reach one at all. Wise judicial supervision of a trial, in that regard, is necessary and is none too often exercised. Manifestly, the court should be mindful of where that duty ends and the duty of the jury begins so that an attempt to discharge the former will not invade the latter. The trial judge in his legitimate field has very broad discretion, and it needs a pretty plain case of prejudicial overstepping of it to warrant condemning the result as tainted with harmful error. *Odette v. State,* 90 Wis. 258, 264, 62 N. W. 1054.

The jury in this case must be presumed to have been men of ordinary intelligence. As such they probably understood from what the court said that a verdict of acquittal or guilty would be received without judicial question of its correctness.

The language complained of was certainly as faultless as that used in *Schwantes v. State,* 127 Wis. 160, 191, 106 N. W. 237, or that used in *Odette v. State,* 90 Wis. 258, 263, 62 N. W. 1054, where the court, among other things, admonished the jury that it was their duty to harmonize the evidence if possible; that they ought not to stand back obstinately, "but should reason together and talk over the exist-

ing differences, if any;" "that it was their duty to meet the testimony in a spirit of fairness and candor with each other;" "to reason together and apply the law as given by the court to the facts in the case, and arrive at some kind of a verdict." That was quite as strong as, "I can see no reason, gentlemen, why you should not agree upon a verdict in this case, and we expect you to." "Render a just verdict," said the court, "without being influenced by prejudice, passion, fear, or favor, and then you will have done your duty to the defendant, to yourselves, and to society." That expression and others in the charge must be looked at in determining whether the jury in any reasonable probability were improperly influenced by the language complained of. It is the opinion of the court that the trial judge was well within his proper field in using such language.

There are two or three other points, briefly presented in the printed argument, but they do not seem to be of sufficient moment to warrant extending this already quite lengthy opinion for the purpose of discussing them. The accused seems to have had a very fair trial and to have been ably defended by a member of the bar appointed for that purpose. The record is exceptionally free from error, and wholly free from harmful error. All of the instrumentalities of the law of the land have been gratuitously at the disposal of the accused to safeguard him against being convicted unjustly. The law has run its full course, and he has had all the advantages he could have had, had he been of high degree and possessed of wealth. If he has been unjustly convicted, which is highly improbable, it is one of the inevitable individual sacrifices for the good of the whole which must, now and then, be the result of any system of law of human origin.

*By the Court.*—The judgment is affirmed.

DODGE, J. (*dissenting*). I am reasonably satisfied that, with one exception, all the assignments of error might fail of fatal effect upon the conviction, though not always upon

the grounds stated in the opinion of the court. There is one, however, which seems to me glaringly erroneous and unavoidably prejudicial. Barnes was permitted to testify, in substance: "I was informed, before the homicide, that *Spick* killed some of my cattle. Boni Lombard informed me." So far as this tended to arouse belief in the jury that defendant, at some remote period, had been guilty of killing cattle, it was mere vilification, and a most unworthy and improper method of prejudicing the accused, in a case of much doubt as to whether he was the person who among all the vicinage committed the obvious homicide. *Paulson v. State,* 118 Wis. 89, 94 N. W. 771. Conceding, however, as my brethren think, that no such improper purpose moved the introduction of the evidence, and that its sole purpose was to prove animosity in defendant toward deceased either as an informer against him or as the custodian of his guilty secret, the error and prejudice are no less clear. Then the only possible material facts are that accused knew or suspected that Lombard had the knowledge or had given the information. But there is no word of evidence that accused either knew or had any ground of suspicion of such facts. The only ground suggested by the prosecution, or in the court's opinion, is that his own guilty consciousness would lead him to such suspicion. But this leaps the very gap which I think insuperable. He could have no such consciousness unless he in fact killed the cattle. That he did so there is absolutely no evidence, except the objectionable testimony of Barnes that Lombard told the latter so—pure hearsay and therefore necessarily inadmissible. *O'Toole v. State,* 105 Wis. 18, 80 N. W. 915; *Campbell v. State,* 111 Wis. 152, 160, 86 N. W. 855; *Baker v. State,* 120 Wis. 135, 149, 97 N. W. 566.

The argument in the court's opinion that admissibility of hearsay evidence may sometimes be sustained by peculiar facts, as to which great deference is due the trial court's decision, is met, primarily, by the circumstances that there

were neither facts nor evidence for the judicial mind to act on to justify hearsay testimony of the only facts from which animosity against the accused, or desire to put him out of existence, could be inferred.   Another obstacle to the efficacy of such argument is, however, that the trial court made no such decision, as the record affirmatively discloses.   He admitted the objectionable testimony, not on any circumstances thought to justify hearsay, but on the ground that "it is allowable to prove additional crimes . . . sometimes to show motive."   That, however, has no relation to remote crimes, not connected with the one charged, and so dissimilar as to have no tendency to evince persistent similar special intent.   Killing A.'s cattle years before has no tendency to prove the special intent in killing B.; nor is it admissible in proof of motive.   *Baker v. State,* 120 Wis. 135, 145, 97 N. W. 566; *Standard Mfg. Co. v. Slot,* 121 Wis. 14, 19, 98 N. W. 923, 1016; *People v. Molineux,* 168 N. Y. 264, 297, 61 N. E. 286.   Thus the trial court has conclusively certified that he in fact proceeded upon an erroneous conception of law, and has excluded the palliation for his admission of this evidence so laboriously invented in the opinion of the court.

I cannot avoid the conclusion that in the respect mentioned error was committed, obviously prejudicial to accused, and must dissent from the affirmance of the conviction.

Winslow, C. J., concurs in the foregoing dissenting opinion.