LASECKI, Plaintiff in error, vs. THE STATE, Defendant in error.

*April 12—May 11, 1926.*

*Homicide: Circumstantial evidence: Sufficiency: Intoxication of defendant: Lack of premeditated design to kill: Second-degree murder: Question for jury: Person convicted of lesser degree cannot urge that proof sustained greater: Evidence: Relevancy: Motive to commit crime had by some one else: Opinion testimony: Cause of death.*

1. The evidence in this case, though circumstantial, is *held* sufficient to support a conviction for second-degree murder, where the accused, who was drunk and who had a revolver, was the last person seen with the deceased while he was alive, and where at the trial his counsel requested that second-degree murder be submitted to the jury. p. 278.

2. One convicted of second-degree murder is in no position to object because the proof warranted a finding of first-degree murder if he was guilty of any offense. p. 278.

3. A homicide, otherwise constituting first-degree murder, committed by one too intoxicated to form a premeditated design to kill, is reduced to murder in the second degree, which is included in and contains all the elements of first-degree murder except premeditated design. p. 279.

4. Where the proof leaves the existence of premeditated design to kill fairly in doubt, the question whether the offense is first or second-degree murder is for the jury, and its verdict is conclusive on the question of the degree of homicide. p. 280.

5. Testimony of the doctor who performed the post-mortem that a bullet wound in the heart caused the death, is *held* proper. p. 282.

6. Evidence that deceased had so conducted his illicit liquor business as to make enemies was not admissible, as the fact that

some one other than the accused may have had a motive
to commit a crime does not make such proof admissible un-
less accompanied by proof that such person was in the vi-
cinity at the time the offense was committed.   The fact
that a witness saw an automobile containing two men near
the scene of the murder shortly before the time it must have
occurred, is *held* insufficient to warrant any inference which
would make the offered proof admissible.   p. 282.

ERROR to review a judgment of the circuit court for
Portage county: BYRON B. PARK, Circuit Judge. *Affirmed.*

On September 15, 1923, the body of Edward Armstrong
was found in a cellarway of an unoccupied house in the
country near Stevens Point.   The condition of the body
indicated that death had occurred some days before the
body was found and that death was caused by a forty-five
caliber bullet which had penetrated the heart.   The deceased
was last seen alive in the early morning hours of Septem-
ber 2, 1923.   The plaintiff in error, hereafter called the
defendant, was a young man twenty-one years of age in
1923 who had roved over a large part of the United States.
He began drinking moonshine whisky in the afternoon of
September 1, 1923, and drank hard liquor repeatedly until
the early morning hours of September 2, 1923.   That night
Armstrong joined the defendant and his companions in
visiting roadhouses and in drinking at frequent intervals
until the party separated in the early morning hours.

When defendant and his companions first met Arm-
strong defendant called one of his companions aside and
stated that Armstrong "has got a roll.   Let's roll him; I
seen it."   Later in the evening defendant told another of
his companions that Armstrong was a bootlegger and must
have money and that he wanted to roll him.   It is com-
monly understood in police circles that "to roll" as thus used
means to rob.

Defendant had access to and an opportunity to secure a
forty-five caliber army revolver on the night in question.

His companions saw a revolver in his possession that night which looked like a forty-five caliber army gun. He showed this gun to his companions and said to one of them: "That is going to get him," meaning Armstrong. From the time defendant first met Armstrong, defendant always rode in the Armstrong car. When Armstrong left the boys around 3 o'clock in the morning defendant alone accompanied him. That was the last time that Armstrong was seen alive. The defendant was next seen some time before daybreak at the home of his brother near McDill, located on the road between the vacant house and Stevens Point. His brother's home was near the place where Armstrong's wrecked automobile was found on the morning of September 2, 1923.

About 4 o'clock in the morning of September 2, 1923, four shots were heard in the vicinity of the vacant house where Armstrong's body was found. A doctor returning from a night call in the country at about half-past 4 in the morning of that day saw a car in the ditch at McDill. This car was later found to be the automobile that belonged to Armstrong. This car was not in the ditch when the doctor passed through McDill at half-past 3 that morning. The tracks of the wrecked car indicated that it had zig-zagged from one side of the road to the other before it was finally wrecked in the ditch. On September 2, 1923, a farmer passing the vacant house where the body was found noticed the tracks of a big car in front of the barn-yard of the vacant house.

Defendant did not return to his father's home in Stevens Point. After staying in the country for two days he went to Wausau and took a night train to Milwaukee. He drifted from place to place and from job to job, moving on when he heard that the officers were looking for him. He asked his companions not to tell any one where he was. Before entering a pool hall in Milwaukee he asked his companions to see if the sheriff from Stevens Point was in the place

looking for him.   He threw a bundle containing his re-
volver into Lake Michigan.   He went to the city limits and
took a car out of Milwaukee, instead of starting from the
downtown district.   When under the influence of liquor
he told of his last drunk at Stevens Point and said that he
had a gun and was out in the country shooting and was
in a car wreck.   The jury found the defendant guilty of
murder in the second degree.   He was sentenced to im-
prisonment in the state prison for the term of sixteen years.

For the plaintiff in error there was a brief by *Fisher &
Cashin* of Stevens Point, and oral argument by *W. E.
Fisher.*

For the defendant in error there was a brief by the
*Attorney General, J. E. Messerschmidt,* assistant attorney
general, *George B. Nelson,* special assistant district attorney
of Portage county, *Byron J. Carpenter,* ex-district attorney,
and *W. E. Atwell,* district attorney; and the cause was
argued orally by *Mr. Nelson* and *Mr. Messerschmidt.*

STEVENS, J.   The proof presents a very strong case of
circumstantial evidence which warranted the jury in find-
ing that the defendant killed the deceased, Armstrong.   The
defendant had suggested to others that they "roll," that
is rob, Armstrong.   The defendant had a revolver which
the jury was warranted in finding to be of the same caliber
as that which was used when Armstrong's life was taken.
Defendant had said that this gun would get Armstrong.
The defendant was the last man seen with Armstrong while
he was alive.   Defendant was in the vicinity of the vacant
house at the time the shot was fired which undoubtedly
caused the death of Armstrong.   The subsequent conduct
of the defendant strongly points to his guilt.   His recital,
while under the influence of liquor, of his experience the
last time he was drunk at Stevens Point when he was shoot-
ing out in the country and was in an auto wreck may well

have led the jury to conclude that he was then describing what took place between the time that Armstrong and the defendant left the roadhouse alone and the time when the defendant appeared at the home of his brother in the early morning hours of September 2, 1923.

The proof which has been outlined in the statement of facts leaves no reasonable doubt in the mind of the court that the defendant shot and killed Armstrong on the morning of September 2, 1923.

2. The defendant urges that if the evidence establishes that he shot Armstrong the judgment must be reversed because the shooting occurred under such circumstances that he was guilty of first-degree murder, if guilty of any offense. Doubtless defendant would not have taken this position had he not known that he could play his game with loaded dice under the rule adopted in *State v. Martin*, 30 Wis. 216. His purpose is to obtain a reversal and at the same time to save the benefit of the acquittal of murder in the first degree. If defendant must be acquitted of all lesser degrees of homicide because guilty of murder in the first degree, then, although he is guilty of an offense which should be punished by imprisonment for life, the defendant must be given his freedom without undergoing punishment. If the court must administer the rules of law so as to work such an injustice in the name of justice, it presents good reason for changing the rule as to former jeopardy when the defendant asks and is granted a new trial. Fortunately no such miscarriage of justice need result in the application of the well established rules of law in this case.

There can be no question but that the defendant was thoroughly under the influence of liquor before he and Armstrong left their companions at the roadhouse in the early morning hours. Before midnight he was so drunk that his companions insisted that others should drive the car.

He continued drinking. His eyes became glassy. His companions noticed that he was very much under the influence of liquor. He staggered so that he had difficulty in getting into his brother's home when he came there in the early morning. He himself testified that he had no recollection as to what occurred after he left the roadhouse until he reached his brother's home. Under this proof the jury might readily give defendant the benefit of the doubt and conclude that he was too much under the influence of liquor to form the premeditated design to kill which is the distinguishing element of murder in the first degree. The jury could well have found that defendant fired the four shots heard coming from the direction of the vacant house at about 4 o'clock in the morning recklessly and without regard for human life and that one of those shots caused the death of Armstrong.

If the defendant fired these four shots in such a way that one of them took the life of Armstrong, such shooting was certainly an act imminently dangerous to others, an act which evinced a depraved mind, regardless of human life. If defendant was too much intoxicated to form a premeditated design to kill, the offense was reduced to second-degree murder. Murder in the second degree is included in murder in the first degree. Given all of the elements of second-degree murder and add the premeditated design and the offense is raised to the first degree. *Radej v. State,* 152 Wis. 503, 510, 140 N. W. 21.

"The border line between murder in the first degree and murder in the second degree is very plain in statutory characterization, but whether it is one or the other is often very difficult of determination on the evidence. So it has been said that if the jury, in any given case, conclude from the evidence that the accused is guilty beyond a reasonable doubt of either one or the other of two offenses, and they are not wholly convinced that it is the greater, they should find a verdict of guilty of the lesser. *Ryan v. State,* 115

Wis. 488, 92 N. W. 271; *Miller v. State,* 139 Wis. 57, 81, 119 N. W. 850, 860. . . . There is such a dense mystery as to just what occurred at the time of the homicide—as to the real characteristics of it,—including the events immediately preceding the fatal shot, that one might hesitate to say death was, beyond a reasonable doubt, effected pursuant to a premeditated design to kill. May not the jury reasonably have entertained from the evidence a fair doubt on that question? Their answer as to that was approved by the learned trial judge. It requires a strong case, made wholly by a written history of a trial, to warrant an appellate court in overruling such a decision. It is the opinion of the court that no such strong case appears here." *Spick v. State,* 140 Wis. 104, 124, 125, 121 N. W. 664.

When proof leaves the existence of the premeditated design to kill fairly in doubt, then the question whether the offense is either first or second-degree murder is for the jury and its verdict is conclusive upon the question of the degree of homicide. *Flynn v. State,* 97 Wis. 44, 48, 72 N. W. 373. It is the settled law of Wisconsin that, whenever a human life is taken under such circumstances that the offense would be first-degree murder if the premeditated design to kill were established, the offense is reduced to second-degree murder if the premeditated design to kill is not established beyond all reasonable doubt and the taking of life occurred under such circumstances as to establish the other elements essential to constitute murder in the second degree. Especially is this true in those cases where the evidence of the intoxication of the accused is such as tends to show an inability to form or an improbability that there was formed a premeditated design to take the life of another. *Spick v. State,* 140 Wis. 104, 125, 121 N. W. 664; *Lillystrom v. State,* 146 Wis. 525, 530, 132 N. W. 132.

At the close of the testimony defendant's counsel requested that the second degree of murder be submitted and proposed instructions applicable to that degree. If the court believed that justice had not been done the defendant,

it would not hesitate to reverse the judgment even though this degree was submitted at the request of defendant's counsel. But this request is significant, because it shows that it was then the deliberate judgment of the two very able and experienced lawyers who conducted the defense that the evidence would sustain a verdict of guilty of the second degree of murder.

The defendant is in no position to complain because the jury took him at his word and found that he did not have a premeditated design to kill at the time he shot Armstrong, because of the fact, as he testified, that he was so intoxicated that his mind was a blank from the time he and Armstrong left the roadhouse until he found himself at his brother's home. *Eckert v. State,* 114 Wis. 160, 164, 89 N. W. 826; *Radej v. State,* 152 Wis. 503, 514, 140 N. W. 21. If the proof warrants a finding of guilty of first-degree murder, the defendant is in no position to object because the jury have found him guilty of a lesser degree of homicide. "How can an accused person, by any possibility, be injured by a conviction of murder in the second degree when he should have been convicted of murder in the first degree? What right has he to complain when the lower degree was found by reliance, to some extent, on his own testimony?" *Radej v. State,* 152 Wis. 503, 515, 140 N. W. 21. But it is not necessary to apply this rule because the evidence very clearly sustains the verdict of murder in the second degree.

The case is remarkably free from rulings upon matters of evidence or of instructions to the jury which could have prejudiced the rights of the defendant. One of the matters most strenuously urged upon the trial was the right of the defendant to show that the deceased, Armstrong, had so conducted his illicit liquor business as to make enemies. This proof was offered for the purpose of raising a question in the minds of the jury as to whether some such

enemy might not have been responsible for the death of Armstrong. The fact that some one else may have a motive to commit a crime does not make such proof admissible unless accompanied by proof tending to connect the person having such motive with the commission of the offense, or at least tending to show that such person was in the vicinity at the time that the crime was committed so that such person would have had an opportunity to commit the offense. Here there was nothing to bring the case within that rule. The fact that one witness saw a big car with two men in the front seat in the vicinity of the vacant house, although upon another road, shortly before the time when the life of Armstrong must have been taken, is not sufficient to warrant the drawing of any inference that would render this proof admissible.

It is clear that no error was committed in permitting the doctor who performed the post-mortem to state, when asked his opinion, that the bullet wound in the heart caused death. *Carthaus v. State,* 78 Wis. 560, 564, 47 N. W. 629; *Boyle v. State,* 61 Wis. 440, 447, 21 N. W. 289.

The instructions to which exceptions were taken were not erroneous, especially when considered with the rest of the charge to the jury. All instructions requested were given in substance in so far as they were applicable to the case at bar.

All of the alleged erroneous rulings of the court have been carefully examined. Some relate to the manner of conducting the trial, where the court was clearly acting within the field of its discretionary powers. Others are so clearly right or of such a character that they could not have affected the substantial rights of the defendant. This record demonstrates the ability with which this long and important trial was conducted both by the trial judge and by counsel for both the State and the defense.

Examination of the entire record satisfies the conscience

of the court that the defendant had a fair trial, that the verdict of the jury was amply sustained by the evidence, that no errors were committed which prejudiced the rights of the defendant, and that justice has been done the defendant. The court desires to express its appreciation of the assistance given it by the able presentation of the case by counsel for both parties upon the oral argument as well as in the printed briefs.

*By the Court.*—Judgment affirmed.